

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## NUMBER 13-12-00051-CR

SHANE JERMAINE MATTHEWS,                                    Appellant,

v.

THE STATE OF TEXAS,                                    Appellee.

## NUMBER 13-12-00052-CR

JOHN LAWRENCE MATTHEWS,                                    Appellant,

v.

THE STATE OF TEXAS,                                    Appellee.

## NUMBER 13-12-00056-CR

DAVID LEWIS HAYWOOD,                                    Appellant,

v.

THE STATE OF TEXAS,                                    Appellee.

**On appeal from the 1st District Court
of Jasper County, Texas.**

# MEMORANDUM OPINION

**Before Justices Garza, Perkes, and Longoria
Memorandum Opinion by Justice Perkes**

A jury found appellants Shane Jermaine Matthews ("Shane"), John Lewis Matthews ("John"), and David Lewis Haywood ("David") guilty of capital murder and assessed punishment at life imprisonment, without parole, in the Texas Department of Criminal Justice, Institutional Division.  *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West 2011).  Appellants were tried together in a single trial.  In each case, the trial court sentenced appellant in accordance with the jury's verdict and appellant timely appealed.[1]

Although no motion to consolidate these appeals has been filed, in the interest of judicial economy, we issue a single opinion herein disposing of all three appeals.  We do so because our review of the records shows that the same facts and similar legal issues are involved in all three appeals.  As set forth below, each appellant raises multiple challenges to his conviction.  We will affirm each conviction.

---

[1] Pursuant to a docket-equalization order issued by the Supreme Court of Texas, these appeals are before this Court on transfer from the Ninth Court of Appeals in Beaumont, Texas.  *See* TEX. GOV'T. CODE ANN. § 73.001 (West 2005).

## I. FACTUAL BACKGROUND

Appellants are three brothers who were each indicted for the capital murder of Jessie Palomo, Jr., by shooting him with a firearm on or about December 13, 2009, in the course of robbing or attempting to rob Palomo. The evidence in this case shows a brutal murder in which Palomo crashed through a motel-room window with trauma to his head and multiple gunshot wounds. At the time, Palomo's pants were pulled down and he was shirtless with his hands wrapped in his shirt in front of him. The witnesses at trial testified as follows.

### A. Accomplice-Witness Testimony

In the jury charge, the trial court instructed the jury that Miesha Kelly was an accomplice witness as a matter of law and that Jason Brown and Melissa Adams were accomplices as a matter of fact if the jury found them to be accomplices. We first summarize the testimony of Kelly, Brown, and Adams.

**Miesha Kelly**

Miesha Kelly first told the jury that she was under indictment for the capital murder of Palomo. According to her testimony, she did not have any agreement with the State concerning her testimony, but she decided to testify truthfully and hoped to avoid a life sentence. She also testified that she had a prior forgery conviction.

Kelly testified she had known John, who also goes by "John Boy," since 1999. They had a daughter together and, at the time of the murder, they lived in Galveston, Texas. She had known Shane since 2007 and David since early 2000. Kelly identified John, Shane, and David in open court.

3

On December 13, 2009, Kelly, John, Shane, and David drove from Galveston to Kirbyville, Texas, in a gold Equinox sports-utility vehicle ("SUV") that belonged to David's girlfriend. John and David told her that morning the purpose of their trip was to buy marihuana and a car. During the drive, they smoked marihuana and they also stopped at a gas station in Baytown, Texas. At that time, David was driving the SUV. Kelly's cousin, Jason Brown, Melissa Adams, and Brown and Adams's minor daughter were at that gas station.

When they left the gas station, Kelly drove and followed Brown, who was leading them to meet the man who had the drugs for purchase. After stopping at a carwash in Kirbyville, Kelly and appellants drove to the convenience store next to the Gateway Motel in Kirbyville. Kelly pulled up to the gas pump, David got out of the SUV to pay for the gas, and he bought a can of soda and a bag of chips.

Kelly then drove appellants to the motel and parked in front of a room. There was already a car parked directly in front of the door to the room. Brown, Adams, and their daughter were outside the car. Kelly exited the Equinox and went into the motel room to use the restroom. Appellants were still in the Equinox. When Kelly entered the room, there was no one else in the room, and she did not recall anything being on the back of the toilet. Kelly did not see a drink or bag of chips in the bathroom.

When she exited the bathroom, Brown and appellants were all inside the motel room. A clerk from the motel called and told Brown there were too many people inside the room. Kelly was going to leave and return to Galveston.

4

Kelly was standing in the doorway of the motel room, leaving, when Palomo pulled up in a gray or blue Cadillac and parked right in front of the doorway. She remembered a woman wearing a red shirt seated in his car. Kelly entered the Equinox and drove away. Soon after, Shane used the walkie-talkie feature of her cell phone and told Kelly to return to the motel. When she returned to the motel, Palomo was lying in front of the motel room and the girl from the Cadillac was coming out with a towel trying to help him.

Kelly did not see Brown. She also did not see appellants, but they were still talking to her via the walkie-talkie feature on her phone. When she saw appellants, they were running from the side of a house on the street just south and behind the motel. Kelly picked them up, and they drove back to Galveston. According to her testimony, she was not told she would be the driver of a "get away car" and she did not know of any plan to commit a robbery.

Kelly testified further that John was dressed in a black hood. David was wearing a black hood with some Dickey-brand shorts. Shane was wearing a white thermal shirt, jeans, and gloves. Kelly described their clothes as baggy and as "hoodie" jackets.

As they were leaving Kirbyville, they passed some police officers with their lights and sirens on. Shane told Kelly to keep going. Shane threatened her. As they drove back to Galveston, Brown called asking where they were, and said he was stuck at the store. Later, Brown called again and told Kelly to dispose of her phone and to get a new phone number.

As they drove, Kelly said that Shane and David talked about shooting Palomo. Shane said he shot Palomo in the back before he went out the window. David said he

5

also shot Palomo. Shane talked about duct tape, and asked David why he did not duct tape Palomo. David said he did, but that Palomo broke loose. Kelly testified that John and Shane also talked about cleaning the car. John was quiet and did not talk to her about the incident while they were driving. Later, John did not tell her anything about a robbery, but he apologized to her for what had happened. She described John as "not shocked or surprised," but nervous.

On the drive back to Galveston, John and David threw out their undershirts. Kelly later took an investigator to the area where the shirts were thrown, but to her knowledge, nothing was found. Once they were back in Galveston, Kelly saw two small guns. Shane had one of the guns, and John gave Shane the gun he had. At least one of the guns was wrapped in clothes. Kelly saw that Shane wore gloves when he exited the car with the guns in Galveston. Up to that point, Kelly had not seen Shane wearing gloves. Kelly testified she did not know that they had the guns when they were driving to Kirbyville. She also did not see duct tape or masks.

In Galveston, they first dropped off Shane. David then dropped Kelly and John off at their house. Rather than returning to their own home, Kelly and John had a woman rent them a motel room in Galveston. Kelly testified that Galveston police arrested them the following morning and that they were taken to the Jasper County Jail. Kelly testified that she gave a false statement to the police in which she talked about a fourth man nicknamed "North Carolina," but that she had invented this person because she was scared.

6

Kelly testified that she is familiar with John's handwriting, and she identified State's Exhibits 64 and 65 as two letters he wrote and sent to her at the jail. When she received these letters, she gave them to her attorney, who then gave them to the District Attorney. In State's Exhibit 64, dated May 14, 2010, John wrote that he needed to "get out to get them tools." Kelly testified that John's reference to "tools" in the letter was about the guns. John also wrote in the letter that he hoped she had not said anything about the "spot," because that is where "dumb took the tools, not swimming." Kelly testified the "spot" was a place where John and Shane hung out. Kelly understood the statement "not swimming" to mean that the guns had not been thrown into the water. John also asked that she please keep her mouth shut about the "spot," and that he really needed her. In State's Exhibit 65, dated May 18, 2010, John again asked Kelly to please keep her mouth shut about the "spot."[2]

When confronted with an earlier statement she made to the police, Kelly affirmed that Shane said he thought Palomo had a gun, or was reaching for a gun, or something; that appellants wrestled with Palomo; and that Shane said he shot Palomo in the back when Palomo was trying to get away by jumping out the window. In discussing her prior statements, Kelly testified that appellants were wiping their hands and faces after the

---

[2] In addition to Kelly's testimony identifying appellant John's handwritten letters, the State offered testimony from other witnesses who were able to identify John's handwriting. For example, Cori Stanley had been a Jail Administrator for Jasper County for two years as of the time of trial. Stanley identified State's Exhibits 61 and 62 as requests for extended visits at the jail that John signed in his presence. State's Exhibits 61 and 62 were admitted without objection.

Wilma Bailey had been a jailer with the Jasper County Sheriff's Office for approximately six years. Bailey identified State's Exhibit 63 as a Medical Costs Agreement form John signed when he was booked into the Jasper County Jail. Bailey identified John in court, and stated that he signed the agreement in her presence. State's Exhibit 63 was admitted into evidence without objection.

incident. John had blood on his mouth, and appellants got blood all over the stereo and the seat belts of the car.

**Jason Brown**

Jason Dayton Brown testified that he was 32 years old, that he lived in Houston, Texas, and that Melissa Adams was his girlfriend. Brown had known Palomo since he was 14 or 15 years old. Kelly is his cousin, and John was Kelly's boyfriend. Brown identified John in court and testified that he had known John for at least five years. Brown also identified Shane and David at trial. Brown testified that he did not go into the motel room with appellants, and denied that he came out of the room after Palomo crashed through the window.[3] Instead, Brown testified as follows.

In the latter part of 2009, John, whom Brown also knew as "John Boy," talked to Brown about buying some marihuana. They did not discuss specifics, but John said that he and his brothers "hit a lick" for $40,000, and asked if Brown knew where they could get some drugs. Brown then called Palomo, because he was a known drug dealer. Palomo said he had 100 pounds of marihuana and the price was $900 a pound. As the middleman,[4] Brown was supposed to receive $100 for every pound sold. Brown then called John, and they arranged to meet Palomo in Baytown. When that meeting did not work out, Palomo asked if they would come to Kirbyville.

---

[3] Shane called James McCaughey as a witness. McCaughey was a reserve officer with the Kirbyville Police Department when he responded to the crime scene. According to McCaughey's testimony, Deldrick Minter gave McCaughey a statement at the scene that placed Brown exiting the motel room as Palomo fell out the window, followed by "three black men" running from the motel room.

[4] Brown testified he was the middleman for the proposed drug transaction. Palomo did not talk to any of the three appellants to negotiate the drug deal.

8

On December 13, 2009, Brown, Adams and their daughter left Houston and drove to Kirbyville. They stopped at a gas station in Baytown on the way. Kelly, John, and his two brothers, Shane and David, were in a gold SUV at the gas station. They followed Brown and Adams from the gas station in Baytown to a car wash in Kirbyville. Brown exited his car and spoke with John at the car wash in Kirbyville.

Afterwards, Brown drove Adams and his daughter to the Gateway Motel where Adams rented the motel room. Kelly and appellants did not immediately follow Brown and Adams to the motel. Adams rented the room using Brown's debit card and gave him the room key. Adams and her daughter left for a family event, as Brown headed for the motel room. When Adams left, neither appellants, Kelly, nor Palomo was at the motel.

Brown understood that the marihuana deal was going to happen in his motel room. Three or four minutes after Adams left, Palomo pulled up driving a dark blue Cadillac STS sedan. Palomo parked right in front of the motel room and Brown could see that he had a woman in the car. Palomo exited his car, and went into the room with Brown to wait. There was no one else in the room and it was clean—there was no evidence that a prior occupant of the room had left any belongings in the room. A clerk from the front office of the motel called the room and told Brown that only one person was supposed to be in the room, so they went back outside and stood at the back of Palomo's car. On cross-examination, Brown acknowledged that a registration ticket from the motel (included in State's Exhibit 1) stated "TWO PERSONS PER ROOM[.] NO VISITORS", and that according to his testimony, the motel clerk called when there were only two people in the room.

9

Although Palomo never showed Brown the marihuana, he was not concerned. According to Brown, if Palomo said he had marihuana, then he had some. Appellants and Kelly then drove up to the motel and pulled in behind Palomo's car. The three men exited the SUV and Kelly drove off. Appellants followed Palomo into the room, and Palomo asked Brown to stay outside with the woman in his Cadillac. Brown gave Palomo the room key and then entered the driver side of the Cadillac. Palomo did not have a bag or other container with him when he went into the room. Appellants did not appear to have a bag or container with them either. Brown recalled appellants wearing dark, baggy clothing, but could not recall any "hoodies."

Inside the Cadillac, Brown and the woman made small talk and played with Palomo's small dog, while Palomo and appellants were inside the motel room. As far as he could tell, they were the only ones in the room. Brown doubted anyone could have entered or exited the motel room without his notice because he was very near the door while he waited in the Cadillac. Brown did not know the woman in the Cadillac; the windows were up, the engine was running. He did not recall if the radio was playing. He did not see or smell anything that made him believe there was marihuana in the car. He waited in the Cadillac "no longer than ten minutes."

Something then went wrong inside the motel room. Palomo "fell through" the room's glass window. Palomo's shirt was off. As soon as Brown saw this, he jumped out of the car, and saw two "guys" with pistols run out of the motel room with hoodies or ski masks on their heads.[5] Brown turned and ran for the nearby store where he hid on

_____

[5] On cross-examination, Brown testified unequivocally that the persons who ran out of the room were wearing masks over their faces.

the side of the store. He did not see a third man, and could not tell who the two men were. He deduced it had to be two of the appellants because only the appellants were inside the room with Palomo at the time. The two men with guns ran towards the highway, but Brown could not say where they went after that.

Brown then saw Deldrick Minter driving past him. He did not see Kelly, her car, nor appellants again at the scene. Brown called a friend, Alvin Booker,[6] to come get him, and went to Booker's house in Magnolia Springs, Texas. He called Adams and, although he did not tell her what happened at the motel room, he did tell her to report her purse stolen because the room was rented in her name. He did not want her to get into trouble when she was not involved with the incident. About two hours later, Brown called Kelly and John, and asked Kelly what "they" wanted him to do. A voice in the background said, "Don't worry about it, you didn't do anything. Don't say nothing."

Brown knew that the police were looking for him, so he told his father where he was, and the police came to get him. That night, Brown gave the police a statement. He was arrested for conspiracy to deliver marihuana and placed in the Jasper County Jail. Brown testified that he is familiar with appellants' voices, and that while he was in jail, he heard Shane speak through the vents and refer to "sticking to the script."

On cross-examination, Brown admitted that he initially lied to the police and even claimed to know nothing about the events surrounding Palomo's death. Brown also admitted that it was his understanding the State would dismiss the charge against him if he offered truthful testimony.

---

[6] In the record, Brown's friend is referred to as "Alvin Booker" and "Alton Booker." The difference is not material to this Court's analysis of the present appeals.

11

**Melissa Adams**

Melissa Adams testified that she was in a twelve-year relationship with Brown and that they considered themselves married. They had a daughter together. Adams testified that on December 13, 2009, Brown drove her and their daughter from Houston to Kirbyville for Adams's father's birthday party. On the drive, they stopped at a gas station in Baytown where they "met up with" a gold SUV. Although she did not know their names, Adams identified appellants, John, Shane, and David, as three of the people who were in the gold SUV. Brown's cousin, Kelly, was also in the gold SUV. Adams believed that she was driving. Adams testified that she and Brown did not get gas at the gas station in Baytown, and that she was not sure why they stopped. She did not recall anyone getting out of the cars. When she asked Brown why they stopped, he just shrugged it off. Adams testified that to her knowledge, the meeting at the gas station was not a pre-arranged meeting.

After the two cars "met up," Adams said they drove to Kirbyville. The four people in the gold SUV followed. Adams estimated the trip from Baytown to Kirbyville took about an hour and a half. She fell asleep about 30 to 45 minutes into the drive; the other car was behind them during the time she was awake. When Adams asked Brown about the people in the other car, he told her not to worry about it. On the drive to Kirbyville, she did not hear Brown on the phone with Palomo or anyone; she had fallen asleep.

When Adams awoke, she, Brown, and their daughter had arrived at the Gateway Motel in Kirbyville. Adams went to the motel's office, rented a room, and paid with Brown's debit card. She rented the room for her, Brown, and their daughter to spend the

12

night. They did not unload their belongings because she was going to get ready for the birthday party at her parents' house. They went to the motel because Brown was not going to the party. Adams identified the receipt from the motel room and her signature on it. The receipt was admitted into evidence as part of State's Exhibit 1. It is dated December 13, 2009 and shows a time of 14:22:44.

Adams told the jury that Brown stayed at the motel while she and their daughter drove to her mother's home for the party. As they left the motel, she did not recall any other cars or people standing outside their room. Although she and Palomo were friends and former classmates, she did not see him at the motel before she left. No one was there but Brown, and he was headed into the room. Adams was not present when any altercation occurred at the motel. Less than an hour after she left the motel with their daughter to go to her mother's house, Brown called and told her that something bad had happened at the motel. Adams left her daughter at her mother's house. She then invoked her right against self-incrimination and would not state where she went next.

When asked whether she had criminal charges against her "stemming from the death of Mr. Palomo," Adams answered, "Yes." Adams acknowledged that she was charged with conspiracy to deliver marihuana and making a false report to a police officer stemming from this investigation, and that her attorney on those charges was in the courtroom. Despite her pending criminal charges and having previously met with the prosecutor, Adams testified that she did not have an agreement with the District Attorney concerning her testimony.

13

**B.    Non-Accomplice Witnesses**

The State presented testimony from fifteen non-accomplice witnesses.   Shane presented testimony from two witnesses.   In pertinent part, their testimony is summarized as follows.

**Euretha Wagner**

Euretha Wagner lived in Beaumont, Texas and was dating Palomo who lived in Bleakwood, Texas with his parents.   On December 13, 2009, she and Palomo drove to the Gateway Motel in Kirbyville.   Wagner testified that she and Palomo were going to get something to eat.   She did not know that he was going to stop at the motel.   At the time, Wagner was twenty years old and Palomo was twenty-seven or twenty-eight.   Wagner had heard that Palomo dealt drugs.

When they arrived at the Gateway Motel, Palomo parked in front of the door of the motel room.   It was the second motel room from the road.   Palomo left the car, a Cadillac STS, running.   A gold SUV was also there.   Wagner did not see anybody in or around the gold SUV.   Once Palomo pulled in, a man Wagner later learned to be Jason Brown exited the motel room and had a short conversation with Palomo outside the Cadillac.   Wagner did not hear the men's conversation.

Palomo and Brown then entered the motel room.   Wagner then saw Brown come out of the room followed by a big woman with short hair.   The woman got into the gold SUV and drove away.   Brown got into the driver's side of Palomo's Cadillac.   Wagner "did not know what to think" of Brown sitting in the Cadillac with her.   It scared her. Brown never told her why he came and sat with her, but after making some small talk he

commented, "I don't know what's taking JJ [Palomo] so long." Brown also mentioned something to her about "counting money."

Wagner testified that she did not see or smell marihuana in the car and did not know why Palomo went to the motel. Wagner denied knowledge of a drug deal. While she waited in the Cadillac with Brown, Wagner did not see anyone else exit or enter the motel room. Wagner testified no one else could have entered or exited the motel room without her noticing it.

Wagner then saw Palomo crash through the motel room window. Brown exited the Cadillac, as did Wagner, and she went to help Palomo. Wagner did not see where Brown went. Brown did not try to help Palomo. Wagner then saw three "guys" run out of the motel room wearing "black hoodies with black masks over their faces." The three individuals went to the left and behind the motel. On cross-examination, Wagner testified that she did not hear any gunshots or see any guns. She also testified that she could not be sure whether the three individuals who ran from the room were men or women, because she could not see their faces.[7]

Wagner knelt beside Palomo who was not responding, breathing, or moving. She saw blood and ran into the room to get a towel to put on Palomo's wounds. She noticed Palomo's pants were pulled down to his ankles, his shirt was off, and, as she later learned, his hands were tied in front of him. She did not believe he could be revived.

---

[7] On cross-examination, Wagner acknowledged that in a prior statement to police, she did not state the number of "guys" who ran out of the motel room. Instead, she just stated "some guys." She testified on cross-examination that at the time of trial, she was sure it was three individuals who exited the motel room after Palomo crashed through the motel room window.

15

At that point, Deldrick Minter drove up. Wagner asked him to call 911. She then called her friend Charles Beatty because he was the first person who came to her mind. Beatty came to the motel and, after seeing Palomo, ran into the hotel room and got a comforter to cover Palomo. Beatty said he needed to get Palomo's father. They then drove Palomo's Cadillac to Palomo's parents' house in Bleakwood. They found Palomo's parents, and told them what had happened. Wagner called her mother and a cousin to ask them to take her back to the motel, where she talked to the police. Wagner testified that, out of fear, she initially gave the police conflicting statements, but that she later decided to tell the truth.

At trial, Wagner identified State's Exhibit 13 as a picture of Brown and State's Exhibit 14 as a photograph of the woman who drove away from the motel in the gold SUV. Wagner was not able to identify appellants as the three people she saw run out of the motel room because she did not see their faces.

**Deldrick Minter**

Deldrick Minter testified that he was 22 years old and lived in Kirbyville. During the afternoon of the murder, Minter was at "Johnny's Stop 'n Stay" store and gas station pumping gas when he heard glass breaking and saw Palomo fall through a motel room window.[8] He then saw three people, all in black, run out of the motel room, turn left, run around the building, and behind the motel. Minter could not tell if they were men or women because of the way they were dressed. He could not see their faces and he did not see the three people again after they ran behind the building.

---

[8] Minter testified that Johnny's Stop 'n Stay was just north of the Gateway Motel. He also testified that he did not realize immediately that it was Palomo who fell through the window.

Minter then saw Brown walk out of the motel room towards the Johnny's Stop 'n Stay where he "caught a ride." Minter did not see Brown again. Minter testified that, right about the same time or a little after, a woman he knew as Lakesha Wagner drove up in front of the motel room in a Cadillac. By the time Minter drove over to the motel parking lot, Wagner had a towel and was getting blood off of Palomo. No one else was around, and the door to the motel room was open. Minter said no one went into the room while he was there. Minter did not touch Palomo, but got close to him, and asked him if he wanted an ambulance. Palomo lifted his head but never said anything. Minter called 911. The police arrived at the scene about twenty minutes later.

**Dr. Tommy Brown**

Dr. Tommy Brown testified he is a forensic pathologist, board certified in anatomic clinical and forensic pathology, and licensed by the State of Texas to practice medicine. Dr. Brown has performed more than 15,000 autopsies during his career and testified as an expert in forensic pathology on many occasions. Without objection, the trial court designated Dr. Brown as an expert witness.

On December 14, 2009, Dr. Brown performed Palomo's autopsy. A copy of his autopsy report was admitted as State's Exhibit 2. In his report, Dr. Brown described Palomo as being 73 inches tall, weighing 300 pounds, and having shorts and trousers pulled down around his knees. He specifically noted that there was no personal property on or accompanying his body.

Dr. Brown identified State's Exhibits 3 through 11 as photographs of Palomo taken during the autopsy. Using the photos, Dr. Brown identified and discussed Palomo's

17

numerous injuries including a number of lacerations to the top and back of his head, some of which extended down to the skull bone. Dr. Brown explained that a blunt-force object, such as the butt or barrel of a pistol, could have caused the lacerations. Through State's Exhibit 10, Dr. Brown described a large, very irregular laceration to the back of Palomo's head that measured 2 ¾ inches and was consistent with having been caused by a gun barrel. Dr. Brown found other cuts and lacerations over and between the knuckles and on the back side of Palomo's right hand, possibly caused by going through plate glass. He also noted other abrasions or superficial scratches on the right thigh possibly caused by going through a window.

Dr. Brown discussed Palomo's two gunshot wounds. The first gunshot wound was to Palomo's right upper arm, about nine inches below his shoulder, where he recovered a small, possibly .22-caliber bullet. The second gunshot wound was to Palomo's mid to low back area. Dr. Brown explained that this bullet travelled back to front, slightly upward, through the lung, and was ultimately recovered from Palomo's chest cavity. Dr. Brown's report described this bullet as being medium to large caliber.

Dr. Brown testified that Palomo's cause of death was the gunshot wound to his back and that the manner of his death was a homicide. Dr. Brown documented the physical evidence he recovered during the autopsy, including Palomo's clothing and the two bullets.

**Gerald Hall**

Gerald Hall worked for the Jasper Police Department, and had received basic and advanced certifications in forged and questioned documents. In the past, he has been

asked to compare known and unknown handwriting samples, and testified on several occasions, including as an expert witness in the courts of Jasper County.

Hall identified State's Exhibits 61 and 62 as two of the known writing samples from John that he used for comparison to the questioned document he analyzed in this case. Altogether, he was provided thirty-six samples of John's handwriting. He described the process by which he compares the handwriting samples: comparing the signature, the speed, the height, the curvature of the strokes, the ends, and a whole variety of characters. Hall identified State's Exhibits 64 and 65 as two letters that he analyzed to determine if John wrote them. Based upon his comparison with John's known writings, Hall testified that John wrote the two letters. State's Exhibits 64 and 65 were admitted into evidence.

**Officer Constance Jordan**

At the time of trial, Officer Constance Jordan had been a certified peace officer for six-and-a-half years, and was a crime scene officer with the Jasper Police Department. She received advanced crime scene training, and her duties included processing and collecting evidence at crime scenes.

On December 13, 2009, Officer Jordan was dispatched to the Gateway Motel at approximately 4:30 p.m. The crime scene was in Room 1 of the motel. There, she found a body covered with a bed spread, right outside the room's window. The window was broken and the door to the room was open. She identified State's Exhibits 17 through 29 as photographs of the scene.

Using the photographs, Jordan explained that State's Exhibit 19 showed the victim having gone face first out the motel room window. State's Exhibit 21 showed the victim's shirt wrapped around both of his arms and duct tape wrapped around one of his arms. There was more duct tape found outside the room on the wall of the motel toward the highway. On cross examination, Officer Jordan further described the photo of Palomo's right wrist with the silver duct tape. She explained that while there was duct tape there, the arms appeared wrapped in the victim's shirt. The duct tape was wrapped over the clothing, not the skin, and her first impression was that it did not look like the victim's hands were bound or tied together with the duct tape. She said that the other pieces of duct tape they found outside the room looked like they had been pulled and torn.

Officer Jordan testified that the motel room was in disarray, with a table and chair overturned and a significant amount of blood on the walls. She took blood samples from various areas of the crime scene for later DNA testing. She testified that State's Exhibit 29 showed the bathroom where she found a Doritos bag and a soda can sitting on the back of the toilet. Officer Jordan described State's Exhibit 34 as showing a twenty-dollar bill recovered from the floor in the open doorway of the motel room. State's Exhibit 38 was a photo that showed a clothing button found next to the twenty-dollar bill. State's Exhibit 39 showed a small broken piece of a gold chain officers recovered in the parking lot just outside the room.

Officer Jordan described a green nylon bag recovered in the motel bathroom. When she looked in the bag, she found rubber gloves. State's Exhibit 41 showed a roll of duct tape found right in front of the dresser in the motel room. State's Exhibit 42 showed

20

a piece of duct tape found outside the motel room. Officer Jordan testified that this piece of duct tape was outside the room's front door, to the left and around the end of the building toward the highway. This piece of duct tape was silver colored as was the roll of duct tape recovered in the room.

**Captain Curtis Frame**

At the time of trial, Curtis Frame was a Captain with Jasper Police Department and had been a certified police officer since 1984. On December 13, 2009, he was a patrol officer with the Jasper County Sheriff's Office, and was dispatched to the Gateway Motel. Captain Frame was also an evidence officer, responsible for the collection and preservation of crime-scene evidence. The Kirbyville Chief of Police asked that Captain Frame process the crime scene. Captain Frame asked Officer Jordan to assist.

Captain Frame testified that the interior of the motel room was in disarray, consistent with a struggle. He also described the duct tape he saw on one of the victim's arms. The duct tape, itself, was wrapped around the victim's right sleeve. The victim's hands were not bound together by the duct tape. Rather, it looked like they were wrapped in the victim's shirt.

**Detective Robert Walker**

At the time of trial, Robert Walker was an investigator and supervisor of criminal investigations with the Jasper County Sheriff's Office. Detective Walker had been a certified peace officer since 1994. On December 13, 2009, he responded to the Gateway Motel. When he arrived, several officers were at the scene, along with a growing crowd. Walker extended the crime scene out to the highway, and took Melissa

Adams to the Kirbyville Sheriff's Office for an interview. Adams initially stated that three individuals forced her at gunpoint to rent the motel room.

Detective Walker testified he interviewed Deldrick Minter. Walker determined that the suspects were black, because another officer at the scene told him that Minter said he saw three black males run out of the motel room around to the back of the motel.[9]

Detective Walker interviewed Brown. Brown initially told him that he set up a sale of a hundred pounds of marihuana at Palomo's request, but that he was not present at the crime scene. Brown never said anything about a car purchase. After talking to Brown, who showed him a phone number on his cell phone that belonged to a person nicknamed "John Boy," Detective Walker developed a list of suspects. According to Brown, John Boy was involved in the drug deal. Walker had Sprint locate John Boy's phone through "GPS," and was told that it was at the Mariner Motel on Galveston Island. Walker then went to Galveston where Galveston Police arrested John and Kelly after they left the motel. Shane and David were also arrested in Galveston.

Kelly gave law enforcement a lead on the car that was loaned to them by David's girlfriend. The car was seized and La Marque Police Department personnel examined it. Detective Walker also collected DNA samples from appellants and Kelly and submitted them to the Texas Department of Public Safety for laboratory testing. Nothing significant was developed from the search of the gold SUV or from the clothing appellants were wearing when they were arrested.[10] According to Detective Walker, Shane's clothes

---

[9] The record shows appellants are black males.

[10] Detective Walker also testified that Brown's jacket was found in the woods behind Booker's house in Magnolia Springs, Texas.

22

had blood on them; however, he did not receive any DNA test results concerning the blood.

On cross examination, when asked specifically what physical evidence was collected to show a conspiracy to commit robbery, Detective Walker could not think of any. There was no physical evidence of drugs or a large amount of money having been at the motel.

On re-direct examination, Detective Walker affirmed that a twenty-dollar bill with the victim's blood on it was found in the motel room. The victim was severely beaten, duct taped, had his pants pulled down to his ankles, and his pockets were emptied. He not a bit of change on him, not even the key to the motel room left in his pockets. The victim was shot and three people were seen running out of the room. There was evidence that two guns and duct tape were used in the offense. Detective Walker believed this was evidence of a robbery.

Detective Walker testified that the evidence against John, Shane, and David also includes Kelly placing them at the motel at the time of the killing. Kelly told him that on the trip back to Galveston, appellants threw out their clothing in Call. Walker searched for the clothing, but did not find any.

**Ginger Eastham**

Ginger Eastham is a forensic firearm and tool-mark examiner for the Texas Department of Public Safety, Tyler Regional Crime Laboratory. She examined the two bullets recovered during Palomo's autopsy to determine their caliber designation and possible firearms that may have fired those bullets. Eastham explained that one lead

23

bullet was consistent with a .22 caliber and the other brass jacketed bullet was consistent with a .38 caliber or 9mm Luger. Her analysis confirmed the two bullets were fired from two different weapons. The bullets were admitted as State's Exhibit 57. Eastham's report was admitted as State's Exhibit 58.

Through cross examination, Eastham explained that possible firearms that could have shot the .22-caliber bullet included pistols, revolvers, and rifles, and that possible firearms that could have shot the 9mm-caliber bullet included only handguns and pistols.

**Mark Wild**

Mark Wild testified he has been a latent print examiner with the Texas Department of Public Safety Austin Crime Laboratory since 2001. As a latent fingerprint examiner, he uses physical and chemical methods to process evidence for latent fingerprints. He compares any developed prints to known sets of fingerprints to determine if they came from the same source. As part of this investigation, Wild processed numerous items for potential fingerprint evidence. Of the items submitted, Wild was only able to develop a usable, comparable latent fingerprint on the Doritos bag that was collected from the bathroom of the motel room.

Wild explained that he used superglue fuming and fluorescent dye staining to develop any latent fingerprints present on the Doritos bag. He then compared the latent fingerprint developed on the bag to the known fingerprints of appellants, Kelly, and Palomo. Wild identified the latent fingerprint on the Doritos bag as the right ring finger of David. The trial court admitted State's Exhibit 60, the Doritos bag, and State's Exhibit 59, Wild's report, into evidence without objection.

24

**Andrew McWhorter**

At the time of trial, Andrew McWhorter was the Manager for the DNA Section at the Texas Department of Public Safety Crime Laboratory in Houston. He received buccal or "cheek" swabs that were taken from appellants and Kelly. He processed and developed DNA profiles from those buccal swabs to generate known profiles for comparison to any evidentiary profiles that might be developed in the investigation. McWhorter identified State's Exhibit 66 as his report, dated October 28, 2010, analyzing the buccal swabs. On January 28, 2011, McWhorter received several other swabs and items for analysis. He identified State's Exhibit 67 as his supplemental report detailing his analysis of these various items.

As detailed in his report, McWhorter testified that the DNA profile developed from the twenty-dollar bill recovered from the motel room was consistent with the DNA profile of the victim, Palomo, and, to a reasonable degree of scientific certainty, Palomo was the source of the DNA on the twenty-dollar bill. He also analyzed a swab from the mouth of the soda can recovered from the motel. McWhorter stated that this DNA profile was consistent with David at all 16 locations, and, to a reasonable degree of scientific certainty, David was the source of the major component of this DNA profile. McWhorter also stated that there was a portion of this DNA profile that was consistent with John's profile.

On cross examination, McWhorter admitted that the portion of the profile that was consistent with John was a relatively common marker and that one in nine African Americans and one in forty-two Caucasian persons have this marker. He could not

25

testify to any reasonable degree of scientific certainty that John contributed to that DNA profile.

## II. ISSUES PRESENTED

Collectively, appellants present eight issues for review. In the interest of brevity, we have reorganized and restated the issues presented as follows:[11]

A. Excluding accomplice testimony, is the evidence insufficient to convict John and Shane of capital murder because it does not prove that they were at the crime scene at the time of the murder?

B. Is the evidence insufficient to convict John, Shane, and David of the offense of capital murder because the required robbery element was not proven beyond a reasonable doubt?

C. Even if the evidence shows John was present when the murder occurred, is the evidence insufficient to show he was a party to the murder, that is, the actions that caused Palomo's death?

D. Did the trial court err by denying Shane's motions for speedy trial and to dismiss the indictment because his speedy trial right was violated?

## III. ANALYSIS

**A. Excluding Accomplice Testimony, Does the Evidence Show John and Shane Were Present at the Time of the Murder?**

By their respective first issues on appeal, John and Shane argue that without accomplice testimony, the evidence is insufficient to show they were at the crime scene at the time of the murder. We disagree.

*(1)* *Legal Standard for Assessing Accomplice Testimony*

Under article 38.14 of the Texas Code of Criminal Procedure, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other

---

[11] *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.")

26

evidence tending to connect the defendant with the offense committed. . . ."   TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (quoting *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)) ("The Legislature has determined that the factfinder should exercise caution when considering the testimony of an accomplice" because "'accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person.'").[12]   The accomplice-witness testimony in a capital murder case does not require corroboration of the elements of the aggravating offense which, in this case, consisted of proof appellants were robbing or attempting to rob Palomo at the time of the murder.   *See McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) (citing *Gosch v. State,* 829 S.W.2d 775, 777 n.2 (Tex. Crim. App. 1991)).

"[C]orroboration is not sufficient if it merely shows the commission of the offense," *id.*, but even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.   *McAfee v. State*, 204 S.W.3d 868, 871 (Tex. App.—Corpus Christi 2006, pet. ref'd) (citing *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996); *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993)).   The absence of "smoking gun" evidence does not invalidate evidence that does connect the defendant to the offense.   *Id.* (citing *Treviño v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999)).   The evidence required to corroborate accomplice testimony does not need to be in itself sufficient to establish guilt beyond a reasonable doubt, nor must it directly

---

[12]   An accomplice is a person who participates with a defendant before, during, or after the commission of a crime and acts with the required culpable mental state.   *Patterson v. State*, 204 S.W.3d 852, 858 (Tex. App.—Corpus Christi 2006, pet. ref'd) (citing *Kutzner v. State*, 994 S.W.2d 180, 187 (Tex. Crim. App. 1999)).

link the accused to the commission of the offense. *Patterson v. State*, 204 S.W.3d 852, 859 (Tex. App.—Corpus Christi 2006, pet. ref'd) (citing *Dowthitt*, 931 S.W.2d at 249; *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); *Munoz*, 853 S.W.2d at 559; *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992)).

When as here, the jury was charged that it could find certain witnesses accomplices as a matter of fact (i.e., Adams and Brown), we may assume for the sake of our analysis that the jury concluded these witnesses were accomplices, and assess the adequacy of the corroborating evidence excluding their testimony.[13] *See Smith*, 332 S.W.3d at 447–48 (excluding testimony of accomplice as a matter of fact and concluding remaining evidence was sufficient to tend to connect defendant to the murders under Texas Code of Criminal Procedure article 38.14); *Yost v. State*, 222 S.W.3d 865, 874 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) ("Even if one assumes the jury found Bridget to be an accomplice, her testimony is amply corroborated."); *see also Bulington v. State*, 179 S.W.3d 223, 230 (Tex. App.—Texarkana 2005, no pet.) ("Even if Tate could be found to have been an accomplice, there is sufficient evidence tending to connect Bulington to the murders.").

### *(2)    Ample Corroborating Evidence*

After eliminating the accomplice-witness testimony of Kelly, Adams, and Brown, from our consideration and conducting an examination of the non-accomplice evidence,

---

[13] We note that, because Kelly was charged with the same offense as appellants, she was an accomplice as a matter of law. *See Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). "A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law." *Id.* "When there is doubt as to whether a witness is an accomplice . . . the trial judge may instruct the jury to determine a witness's status as a fact issue." *Id.* In each case, the trial court instructed the jury that Kelly was an accomplice as a matter of law and instructed the jury to determine whether Adams and Brown were accomplices as a fact issue.

we conclude that considering the combined force of all the non-accomplice evidence that tends to connect John and Shane to the offense, the non-accomplice evidence sufficiently corroborates the testimony of the accomplice witnesses, and shows their presence at the crime scene at the time of the murder. *See Smith*, 332 S.W.3d at 442; *McDuff*, 939 S.W.2d at 613. The non-accomplice evidence that tends to connect John and Shane to the crime scene at the time of the murder can be summarized as follows:

- Consistent with Kelly and Brown's accomplice testimony placing appellants in the Gateway motel room at the time of the murder, the day of the offense, Minter told law enforcement he saw three black males run out of the Gateway Motel room.

- According to Minter's trial testimony, it was after he saw Palomo crash through the motel room window, that he saw these individuals with hoodies run out of the Gateway Motel room.

- Wagner saw three "guys" or individuals run out of the motel room wearing "black hoodies with black masks over their faces."

- Consistent with Kelly's testimony about where she picked up appellants, Minter told law enforcement he saw these males run around to the back of the motel.

- Wagner testified the three individuals went to the left and behind the motel.

- Consistent with Brown's testimony that the "guys" who exited the motel room had pistols, according to Eastham's testimony, at least one of the weapons used to shoot Palomo was necessarily a hand gun or pistol and the other weapon was a pistol, revolver, or rifle.

- Consistent with Kelly's testimony that Shane and John had two small guns she saw when they returned to Galveston, Eastham testified the two bullets recovered during Palomo's autopsy were fired from two separate guns.

- Consistent with Kelly's testimony that she observed Shane wearing gloves when he handled the guns, a rubber glove was found at the crime scene and according to Wild's testimony, little fingerprint evidence was obtained at the crime scene.

- John and Shane were arrested in Galveston, consistent with Kelly's testimony they returned to Galveston after the offense.

- After the offense, John fled to the Mariner Hotel in Galveston instead of staying in his own home in Galveston, and he had a third party rent the room at the Mariner for him.[14]

- The crime scene was bloody and, according to Detective Walker's testimony, at the time of his arrest in Galveston, Shane's clothes appeared to have a lot of blood on them.

- Consistent with Kelly's testimony that during the drive back to Galveston, Shane talked about using duct tape during the offense and having shot Palomo in the back before Palomo fell through the window, duct tape was found at the crime scene and the autopsy revealed Palomo was shot in the back before he fell through the window.

- After the offense, John wrote Kelly from jail telling her to keep her mouth shut.

- The DNA on the Dorrito bag and the soda can found at the crime scene matched David's DNA, and the DNA on the soda can did not exclude John's DNA; thus, at least to some extent, this evidence corroborates Kelly and Brown's testimony that the three persons in the motel room at the time of the murder were appellants.

In John and Shane's respective appeals, we overrule issue one.

## B & C. Is the Evidence Sufficient to Show Appellants Committed the Murder in the Course of a Robbery or Attempted Robbery and that John Participated in the Capital Murder?

In issue two in Shane's appeal, issues one and two in David's appeal, and issue three in John's appeal, appellants argue that the evidence is insufficient to prove beyond a reasonable doubt the murder was committed during the course of committing robbery or attempted robbery against Palomo.[15]   Proof of this element is necessary to elevate the

---

[14]   As discussed below in greater detail, flight and renting a hotel room under another person's name are circumstances showing a defendant's consciousness of guilt for the crime with which he is charged.   *See Yost v. State*, 222 S.W.3d 865, 875 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd); *see also Hyde v. State,* 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi 1993, pet. ref'd) ("A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt.").

[15]   To the extent appellants argue the evidence was factually insufficient to prove the robbery element beyond a reasonable doubt, we note that we review both a legal sufficiency challenge and a factual sufficiency challenge under the same *Jackson v. Virginia* sufficiency standard.   *See Jackson v. Virginia*, 433 U.S. 307, 318–19 (1979); *Brooks v. State*, 323 S.W.3d 893, 894 (Tex. Crim. App. 2010) (plurality op.); *Ervin v. State*, 331 S.W.3d 49, 54 (Tex. App.—Houston [1st Dist.] 2010, pet ref'd).   In *Brooks*, the Court of

offense from murder to capital murder.  *See* TEX. PENAL CODE ANN. §19.03(a)(2) (West 2011).   By his second issue on appeal, John argues the evidence is insufficient to show he participated, as a principal or as a party, in the murder, that is, the actions that caused Palomo's death.   We disagree with appellants' respective sufficiency challenges.

### (1)   Standard of Review for Sufficiency of the Evidence

In reviewing the sufficiency of the evidence to sustain a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).   We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."   *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).   When faced with conflicting evidence, we presume that the trier of fact resolved any such conflict in favor of the prosecution, and we defer to that resolution.   *State v. Turro*, 867 S.W.2d 43,

---

Criminal Appeals eliminated factual sufficiency review of the elements the State is required to prove beyond a reasonable doubt and stated "[i]t bears emphasizing that a rigorous and proper application of the *Jackson v. Virginia* legal sufficiency standard is as exacting a standard as any factual sufficiency standard (especially one that is 'barely distinguishable' or indistinguishable from a *Jackson v. Virginia* legal-sufficiency standard)."   *Brooks*, 323 S.W.3d at 905–06.   Thus, we no longer refer separately to legal and factual sufficiency review.   *See id.*

To the extent appellants argue the evidence is insufficient to show the robbery element because the evidence does not exclude every other reasonable hypothesis other than the guilt of the accused, we note that citing *Brooks*, the Texas Court of Criminal Appeals recently held that the reasonable alternative hypothesis construct does not apply in a sufficiency review under the *Jackson* standard because the construct was overruled in *Geesa v. State*.   *See Cortez v. State*, No. AP-76101, 2011 WL 4088105, at *1 (Tex. Crim. App. Sept. 14, 2011) (not designated for publication) (citing *Geesa v. State*, 820 S.W.2d 154, 155 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000)).

47 (Tex. Crim. App. 1993). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 13; *Kuciemba v. State,* 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). Under the *Jackson* standard, we are not required to exclude accomplice testimony in conducting our sufficiency review. *See Taylor v. State*, 10 S.W.3d 673, 684 (Tex. Crim. App. 2000) (distinguishing statutorily-imposed sufficiency review from sufficiency review derived from constitutional principles and explaining accomplice-witness testimony can be sufficient to sustain a conviction under the *Jackson v. Virginia* standard).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* In each case, a hypothetically correct jury charge would state that appellant is guilty of capital murder as alleged in the indictment if he (1) intentionally committed the murder of Palomo (2) in the course of committing or attempting to commit robbery. *See* Tex. Penal Code Ann. § 19.03(a)(2). As defined by a hypothetically correct jury charge, a robbery occurs when, in the course of committing theft and with intent to obtain or maintain control of [another person's] property, a person (1) intentionally, knowingly, or recklessly, causes bodily injury to another; or (2)

intentionally or knowingly threatens or places another in fear of bodily injury or death. *Id.* § 29.02. A person commits theft if he unlawfully appropriates property with intent to deprive the owner of the property. *Id.* § 31.03(a). However, "[n]o completed theft is required in order for the proscribed conduct to constitute the offense of robbery." *White v. State*, 671 S.W.2d 40, 41–42 (Tex. Crim. App. 1984).

The jury was instructed on the law of parties, which states that a person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011). When we review the sufficiency of the evidence supporting a defendant's participation as a party to the crime, "we may consider 'events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *King v. State*, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000) (quoting *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994)).

## *(2)  The Sufficiency of the Evidence*

In *McKinney v. State*, the First Court of Appeals held that the evidence was legally sufficient to support a finding that a defendant committed capital murder while acting as a principal or party to attempted burglary or attempted or actual robbery. 177 S.W.3d 186, 200 (Tex. App.—Houston [1st Dist.] 2005)*, aff'd,* 207 S.W.3d 366 (Tex. Crim. App. 2006). The evidence showed the defendant knowingly drove to the home of a drug dealer who had significant amounts of money and drugs. *Id.* The defendant and his co-actor

brought guns with them to the drug dealer's home, intentionally shot victims at the home, and in a statement, the defendant stated he saw his co-actor grab one victim by the hair, point a gun at her, and demand to know the location of valuables. *Id.* The appellate court concluded this was sufficient evidence to show the defendant acted as a principal or party to the offense of attempted burglary or attempted or actual robbery. *Id.* at 200–01.

In *Slomba v. State*, the Sixth Court of Appeals held that sufficient circumstantial evidence showed defendant attempted to rob a bank employee. 997 S.W.2d 781, 783 (Tex. App.—Texarkana 1999, pet. ref'd). In *Slomba*, the defendant was dressed in black clothing when he charged at a bank employee as she unlocked the bank. *Id.* at 782. Although the employee managed to enter the bank and lock the door, leaving defendant outside, defendant was found within minutes, crouching near a building with a loaded pistol, a bag, and a black mask or hood. *Id.* The appellate court explained the defendant's acts toward the employee showed intent to use force to obtain or maintain control of property and the items found in his possession also supported an inference the defendant intended to commit a robbery. *Id.* at 783.

In this case, as in *McKinney*, the evidence shows appellants brought firearms to meet a drug dealer, Palomo, who could provide a significant amount of drugs, worth at least $30,000. *See McKinney*, 177 S.W.3d at 200. In addition, appellants brought duct tape, a large nylon bag, masks and/or hoodies, and rubber gloves to their meeting with Palomo. These items show intent to commit robbery. *See Slomba*, 997 S.W.2d at 783.

As revealed by the autopsy report, prior to shooting Palomo, appellants caused severe blunt-force trauma to his head. Palomo was bound with duct tape, his pockets

34

were emptied, and his twenty-dollar bill was left on the floor. A small broken piece of a gold chain was also found in the parking lot right outside the motel room. While the middleman, Brown, testified the plan was for appellants to purchase drugs from Palomo at the motel room, Kelly testified that David and John told her their purpose in going to the motel room was to obtain a car and marihuana. According to Kelly, she left all three appellants at the Gateway Motel, hours from their hometown of Galveston, without transportation.

After Palomo crashed through the motel room window, appellants fled the scene and hid behind the hotel waiting for Kelly to come back and drive them to Galveston. Shane threatened Kelly and told her to keep going when law enforcement vehicles with activated sirens neared them as they drove away from Kirbyville. John had blood on his mouth after the incident. John and David threw their undershirts out of the SUV as Kelly drove. Shane and David discussed the shooting in the SUV as Kelly drove the three appellants back to Galveston. John appeared nervous after the murder and Kelly saw him give Shane a small gun which Shane handled with gloves. After appellants returned to Galveston, John apologized to Kelly and had a woman rent a motel room for them, rather than staying in their own home. After his arrest, John wrote Kelly letters from jail telling her to "keep her mouth shut" about the location where the guns were hidden, and that "Dumb" had hidden the guns in "the spot," but had not thrown them in a body of water.

"A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt." *Hyde v. State,* 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi 1993, pet. ref'd) (quoting *Torres v. State,* 794 S.W.2d 596, 598–600 (Tex. App.—Austin 1990, no

35

pet.)). "It is consequently a well accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged." *Torres,* 794 S.W.2d at 598 (internal quotations omitted). In this case, appellants' flight from Kirbyville, instructions not to pull over when passed by police officers with their lights and sirens on, and John's decision to hide in a hotel, support an inference that appellants sought to evade arrest because they are guilty of the charged offense. *See Yost*, 222 S.W.3d at 875.

Viewing all the evidence in a light most favorable to the verdict, we conclude it allowed a reasonable trier of fact to find that each appellant, as a principal or as a party, intentionally committed the murder of Palomo in the course of committing or attempting to commit a robbery of Palomo. *See* TEX. PENAL CODE ANN. §§ 19.03(a)(2), 29.02. The evidence is sufficient to support each conviction. *See Brooks*, 323 S.W.3d at 895; *see also McKinney*, 177 S.W.3d at 200–01; *Slomba*, 997 S.W.2d at 783. We overrule issue two in Shane's appeal, issues one and two in David's appeal, and issues two and three in John's appeal.

**D.    Did the trial court err in denying Shane's motions for speedy trial and to dismiss the indictment because his speedy trial right was violated?**

In his third issue, appellant Shane Matthews argues that the State violated his right to a speedy trial under the United States and Texas Constitutions and under Texas Code of Criminal Procedure article 1.05.[16]    *See* U.S. CONST. amends. VI, XIV; TEX. CONST. art.

---

[16] Although appellant mentions article 1.05 of the Texas Code of Criminal Procedure in his argument, he does not cite any authority or develop an argument that his speedy-trial right under article 1.05 expanded or differed from his speedy-trial right under the United States and Texas Constitutions.

36

I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05 (West 2005); *see also Webb v. State,* 36 S.W.3d 164, 172 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (en banc) (noting that sixth-amendment right to speedy trial under the federal constitution applies to the states through the Fourteenth Amendment).   We disagree.

### *(1)     Standard of Review*

We balance the same four factors to determine whether a defendant's right to a speedy trial has been violated under the federal and state constitutions: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) the prejudice to the defendant resulting from the delay.   *See Zamorano v. State,* 84 S.W.3d 643, 648 n. 12 (Tex. Crim. App. 2002); *Webb,* 36 S.W.3d at 172.   None of these factors is a necessary or sufficient condition to finding a speedy-trial violation. *Zamarano,* 84 S.W.3d at 648; *Webb,* 36 S.W.3d at 172.   Rather, the factors are related and should be evaluated in conjunction with any other relevant considerations. *Zamarano,* 84 S.W.3d at 648; *Webb,* 36 S.W.3d at 172.

In assessing a trial court's ruling on a speedy-trial claim, we apply a bifurcated standard of review.   *Zamarano,* 84 S.W.3d at 648; *Webb*, 36 S.W.3d at 172.   We use a *de novo* standard of review for the legal components and an abuse-of-discretion standard for the factual components.   *Zamarano*, 84 S.W.3d at 648; *Johnson v. State*, 954 S.W.2d 770, 772 (Tex. Crim. App. 1997); *Webb*, 36 S.W.3d at 172.   In reviewing a trial court's ruling on a speedy-trial motion, we do not consider arguments that are made for the first time on appeal.   *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003).   Instead,

---

TEX. CODE CRIM. PROC. ANN. art. 1.05 (West 2005).   Accordingly, we will not separately address article 1.05.   *See* TEX. R. APP. P. 38.1.

we consider the trial court's ruling in light of the arguments, information, and evidence available to the trial court at the time it ruled. *Id.*

## *(2) Discussion and Analysis*

### *(a) Length of the Delay*

The delay is measured from the time the defendant is formally accused or arrested until the time of trial. *United States v. Marion,* 404 U.S. 307, 313, (1971); *Emery v. State,* 881 S.W.2d 702, 708 (Tex. Crim. App. 1994). We must find this delay presumptively prejudicial before we inquire into the other three factors. *Barker v. Wingo,* 407 U.S. 514, 530 (1972); *Webb*, 36 S.W.3d at 162. There is, however, no *per se* length of delay that automatically constitutes a violation of the right to a speedy trial. *Hull v. State,* 699 S.W.2d 220, 221 (Tex. Crim. App. 1985) (en banc). Most delays of eight months or more are considered presumptively unreasonable and prejudicial. *Marion,* 404 U.S. at 313.

In this case, Shane was arrested on or about December 15, 2009, and was unable to post bond. The indictment was filed February 23, 2010. In June 23, 2011, Shane filed a motion for a speedy trial. On October 13, 2011, the trial court held a hearing on the motion and denied it. At the hearing, defense counsel argued that Shane would be "honored" to have an October 17, 2011 trial date and asked for trial to commence on that date. Trial commenced on December 11, 2011, nearly two years after the murder. The record reflects that he remained incarcerated in the Jasper County Jail between his arrest and his trial in December 2011. Because we conclude, for the sake of argument only, the delay in the Shane's trial is presumptively prejudicial, we address the remaining three factors. *See Webb,* 36 S.W.3d at 173.

### (b) Reason for the Delay

The second factor we consider is the reason for the delay. *See Webb*, 36 S.W.3d at 173. The State has the burden of showing excuse for the delay, and in the face of a silent record, we presume there was not a valid reason for it. *See Emery*, 881 S.W.2d at 708; *Crowder v. State,* 812 S.W.2d 63, 67 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd). We consider whether the delay was due to deliberate attempts to hamper the defense, justified circumstances (such as missing witnesses), or more neutral reasons (such as overcrowded court dockets). *Webb,* 36 S.W.3d at 173. A defendant who has or shares responsibility for the delay may lose his right to a speedy trial. *See Dickey v. Florida,* 398 U.S. 30, 48 (1970); *Munoz v. State,* 991 S.W.2d 818, 822 (Tex. Crim. App. 1999). Thus, we evaluate the defendant's actions and omissions as well as those of the State.

The clerk's record shows, and Shane's counsel acknowledged at the speedy-trial hearing, that defense counsel sought a continuance of a docket call on April 1, 2010, because counsel needed to appear in another court. As a result, the docket call was rescheduled for May 6, 2010. At the speedy-trial hearing, although the parties focused on the length of the delay, the State did not present any explanation. That alone, however, is not dispositive of the speedy-trial claim. *See Burton v. State*, 805 S.W.2d 564, 572 (Tex. App.—Dallas 1991, pet. ref'd) (weighing unexplained eight-month period of delay against State, but not finding it dispositive of speedy-trial claim when appellant absconded for four years). Though we find the period of substantial delay is unexcused because it is unexplained, we must consider it in light of other circumstances, such as

prejudice, to determine whether the delay requires dismissal of the case. *See U.S. v. Taylor*, 487 U.S. 326, 341 (1988); *Burgett*, 865 S.W.2d at 597.

### *(c) Appellant's Assertion of His Right to a Speedy Trial*

The third factor we consider is whether the defendant asserted his right to a speedy trial. *See Webb,* 36 S.W.3d at 173. A criminal defendant must assert this right. *Id.* If he does, the court must give strong evidentiary weight to his assertion. *Crowder,* 812 S.W.2d at 67. The reviewing court, however, must view these assertions in light of the defendant's other conduct. *U.S. v. Loud Hawk*, 474 U.S. 302, 314 (1986); *Burgett v. State*, 865 S.W.2d 594, 598 (Tex. App.—Fort Worth 1993, pet. ref'd).

Shane was incarcerated for over a year before he filed his speedy-trial motion on June 23, 2011. At the hearing held on October 13, 2011,[17] Shane's defense counsel informed the trial court that Shane would be satisfied with an October 17, 2011 trial date. The record shows that the trial commenced less than two months thereafter. This factor weighs against Shane's speedy-trial claim. *See Kelly v. State*, 163 S.W.3d 722, 729–30 (Tex. Crim. App. 2005) (concluding defendant's delay in asserting speedy-trial motion and commencement of trial two months after defendant asserted speedy-trial motion weighed against defendant).

### *(d) Prejudice to Appellant*

Finally, we consider whether prejudice resulted from the delay. *See Webb*, 36 S.W.3d at 174. Although the defendant need not show actual prejudice, he must make a *prima facie* showing of prejudice. *Munoz*, 991 S.W.2d at 826. The burden then shifts to the State to show the prejudice did not exceed that which occurs from the ordinary and

---

[17] The record is silent regarding why the hearing was not held until some four months later.

inevitable delay. *Id.* In determining whether the defendant suffered prejudice, we consider whether the three discernible interests that the speedy-trial right was designed to protect were affected: (1) prevention of oppressive pretrial incarceration; (2) minimization of the accused's anxiety and concern; and (3) limitation of the possibility that the accused's defense will be impaired. *Id.* Interference with the third subfactor, though not necessarily dispositive of a speedy-trial claim, is the most serious because the inability of the defendant to properly prepare his case jeopardizes the entire fairness of the trial. *Id.*

In deciding whether pretrial incarceration is oppressive, the determinative consideration is the incarceration's effect upon the defendant. *Id.* at 828. Incarceration affects a defendant's livelihood and family life and enforces idleness. *Barker,* 407 U.S. at 532. In *Munoz,* the Texas Court of Criminal Appeals found a seventeen-month delay inherently oppressive because the defendant was incarcerated throughout the delay and because the appellate court was bound to defer to the trial court's implied finding that the defendant experienced anxiety exceeding that which ordinarily and inevitably would accompany pretrial incarceration. 991 S.W.2d at 828. In this case, the record contains no evidence of prejudice resulting from the delay in bringing appellant's case to trial. Accordingly, after evaluating these subfactors, we conclude appellant suffered minimal, if any, prejudice. *See Munoz,* 991 S.W.2d at 829.

### *(e) Balancing the Factors*

We must now balance the four factors to determine whether appellant was denied his right to a speedy trial. *Webb,* 36 S.W.3d at 175. On the one hand, the State failed to explain nearly two years of delay and offered little evidence of its diligence in trying

appellant's case. *See Barker,* 407 U.S. at 533–37 (noting close case but denying speedy-trial claim when four years of five-year delay unexcused; defendant did not assert right to speedy trial, and prejudice was minimal). On the other hand, appellant indicated through his counsel that he would be satisfied with an October 17, 2011 trial date. The trial commenced less than two months later, and appellant offered no evidence of prejudice. After balancing these factors under the applicable standard, we find appellant was not denied his right to a speedy trial. Accordingly, we overrule Shane's third issue on appeal.

## IV.  CONCLUSION

We affirm the trial court's judgment in each case.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
25th day of July, 2013.