James Kevin **YOST**, Appellant

v.

The **STATE** of Texas, Appellee.

No. 14–05–01145–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

April 24, 2007.

Perry R. Stevens, Angleton, for appellants.

David Bosserman, Angleton, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

Appellant James Kevin Yost was convicted of the murder of his twelve-year-old stepdaughter. On appeal, he contends that the jury improperly considered the testimony of his common-law wife, Bridget Farmer, who pleaded guilty to the offense of injury to a child. Appellant argues that his wife is an accomplice, that her testimony is uncorroborated, and that the evidence would have been legally insufficient to support his conviction if his wife's testimony had been properly excluded under the accomplice-witness rule. In two additional issues, he challenges the factual sufficiency of the evidence and the lack of jury unanimity on his state of mind.

We conclude appellant's wife is not an accomplice as a matter of law, and her testimony was corroborated. Therefore, even if the jury determined that Bridget Farmer was appellant's accomplice as a matter of fact, it could properly consider her testimony. We further conclude that the evidence is factually sufficient to support the conviction, and that a general verdict was appropriate. We therefore affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At about 3:00 a.m. on December 29, 2003, police and emergency medical personnel arrived at appellant's residence in response to a 911 call for assistance with a sick child. At the home, they discovered twelve-year-old Anna Farmer's body on the floor by her bed. Her body was cold, and rigor mortis had already begun to set in. Bridget Farmer, Anna's mother and appellant's common-law wife, testified to the events leading up to Anna's death.

According to Bridget, appellant had a history of isolating and abusing Anna. He kept Anna locked in her bedroom, and she was not allowed to speak to her siblings. He even forbade Anna's mother from speaking to her. At appellant's orders, Anna did not attend school, but spent her days accompanying him to his work tending a booth at a flea market or copying verses from the Bible. At times appellant would not allow her to use the restroom, telling her to use her bedroom instead. According to Bridget, appellant punished Anna by forcing her to take cold showers or beating her. In one such episode, he paddled her with a board so hard that Anna's skin split and bled. In another instance, he struck Anna's head with such force that she had swelling and black eyes for over a week. After both of these incidents, appellant told Bridget that he had lost his temper because Anna "fought" him. Bridget further testified that appellant would not allow her to seek medical treatment for Anna after these beatings. Moreover, she stated, appellant threatened to kill Anna if Bridget left him.

Bridget also supplied all of the testimony regarding events that occurred on December 28 and the early hours of December 29, 2003. According to Bridget, Anna

accompanied appellant to his booth on the morning of December 28. Sometime around midday, appellant called Bridget and told her to come to the flea market so he could go to another booth to pay rent. Bridget stayed with Anna while appellant paid the rent, and when he returned, Bridget took Anna to the restroom. Anna complained that her stomach hurt, and Bridget took Anna home and sent her to her room. Bridget testified that a short while later, she checked on Anna, and Anna said that she had thrown up, but had cleaned it up. Bridget testified that she gave Anna some juice and told her to lie down.

According to Bridget, appellant arrived home at approximately 5:00 p.m., turned on the heater, and went into Anna's room. Although the air conditioning and heating unit muffled the sound, Bridget heard three bumps against Anna's wall, and heard Anna say, "Ouch." Bridget testified that a short time later, appellant came out of Anna's room looking scared and told Bridget that Anna was not breathing. According to Bridget, "[appellant said] it wasn't something he just did. It must have been something he did the day before."

Bridget said she attempted CPR, but was unsuccessful. She further testified that appellant asked her to help him dispose of Anna's body, but she refused. According to Bridget, she told appellant she wanted to call 911, but appellant did not allow her to do so, and told her that if she did call, they would both go to prison. Bridget testified that appellant then gathered some of his belongings, the title to his truck, the telephones, the fax receiver, and the keys to both vehicles. He instructed Bridget to wait until the next day before calling 911 to give him a "head start," and left at around 9:00 p.m. Several hours later, Bridget found an old phone, called her aunt, and left a message for her mother. After her mother returned her call, Bridget finally called 911. It was then approximately 3:00 a.m. on December 29, 2003. According to Bridget's testimony, Anna had been dead approximately eight hours by the time police and other emergency personnel arrived.

At appellant's trial, Texas Ranger Richard Shing testified that appellant was apprehended at a Dallas motel on January 1, 2004. Evidence collected from the motel showed that appellant had registered using a false name and address on December 30, 2003. Shing testified that there was a "for sale" sign on appellant's truck in the motel parking lot.

Appellant was returned to Brazoria County and charged with murder;[1] Bridget was charged with two counts of injury to a child by failing to provide Anna with proper nourishment and medical care. As part of a plea agreement, Bridget pleaded guilty to both counts, received ten years of probation for each count, and agreed to relinquish her parental rights to her three remaining children. She also agreed to testify against appellant.

Like Bridget, Anna's younger half-sister P.W. testified that appellant routinely isolated Anna from the rest of the family. According to P.W., appellant kept Anna locked in her bedroom while Bridget, P.W., and appellant's two small children slept in the living room of the trailer. While the rest of the family ate together, appellant

---

1. Specifically, appellant was charged with Anna's murder by striking her with an unknown object, and either intentionally or knowingly causing her death, or intentionally or knowingly committing an act clearly dangerous to human life with the intent to cause serious bodily injury. As part of the same criminal episode, appellant was also indicted for injury to a child and aggravated sexual assault; however, the State elected to prosecute the murder charge separately.

forced Anna to eat standing at the counter. She was allowed only five minutes to eat, and when at home, she was usually allowed to eat only sardines, beets, and kidney beans. P.W. further testified that sometimes when appellant and Anna were in Anna's bedroom, she heard banging sounds coming from the room. P.W. related that she heard appellant tell Bridget weekly or even daily that he would kill Anna someday. P.W. also described how appellant forced Anna to copy Bible verses all day, and testified that he monitored Anna on a surveillance camera installed in her bedroom. According to P.W., appellant frequently referred to Anna using various slurs, calling her a "wetback" and a "bitch." P.W. testified that appellant let Anna sit at the table at Christmas that year, but because P.W. left to visit her biological father on December 26, she could not testify to events after that time.

Medical examiner Stephen Pustilnik testified that, at the time of her death, Anna was underweight, extremely malnourished, and chronically dehydrated. He also testified at length regarding Anna's many internal and external injuries, bruises, and scars, and pointed out the symptoms and effects of Anna's prolonged starvation. He opined that chronic child abuse was a contributing cause of her death. Dr. Pustilnik identified large scars on Anna's buttocks as the result of repeated abusive paddling, and explained that head injuries Anna received more than forty-eight hours before her death had made her scalp soft and spongy from the accumulation of blood in the tissue. He further testified that Anna had blood in her vaginal vault and in the surrounding tissue, including hemorrhaging to her rectal vaginal septum. According to Dr. Pustilnik, these injuries were caused by a blunt object penetrating Anna's vagina or rectum with such force that tissues in these areas and in the area around Anna's bladder hemorrhaged. Dr. Pustilnik thought it likely that these injuries occurred less than an hour before Anna's death, but they could have occurred as long as forty-eight hours before her death.

Finally, Dr. Pustilnik testified that Anna's death was caused by multiple blunt force trauma to her abdominal area. More specifically, he testified that separate blows to her upper abdomen, delivered during the same beating, lacerated her liver and ruptured her duodenum. Although each of these injuries was independently capable of causing death, neither caused death immediately. According to Dr. Pustilnik, Anna did not die from either of these injuries for several hours, and possibly as many as forty-eight hours. During this time, a large amount of blood and fluid accumulated in the soft tissues and cavity of Anna's abdomen. These injuries and their effects could in turn produce stomach pain, nausea, and vomiting, and eventually produced the shock, hypotension, and/or sepsis that was the mechanism by which death occurred.[2] According to Dr. Pustilnik, there was a chance that Anna might have survived if she had received immediate medical attention.

Aside from Bridget's testimony indicating that Anna died shortly after 5:00 p.m. on December 28, 2003, the evidence does not pinpoint the exact time of Anna's death. Anna's death certificate does not even list the date of her death; rather, it reports that her body was "found" at 3:00 a.m. on December 29, 2003.[3] The evidence

2. Dr. Pustilnik explained that, due to post-mortem chemical changes, the exact mechanism of Anna's death could not be determined.

3. Incongruously, the certificate lists the time of Anna's death as 6:07 a.m., but does not list the date of death. Moreover, this time is three hours after the time when her body was reportedly found. Inasmuch as the certificate

is undisputed that when emergency personnel and police arrived at approximately 3:30 a.m. on December 29, Anna's body was already cold, and rigor mortis had set in. Appellant also offered the testimony of one of the responding paramedics that blood had begun to pool on the back of Anna's body. No witnesses testified regarding the amount of time that likely elapsed between Anna's death and this degree of rigor mortis or blood pooling.

After hearing the evidence, a jury found appellant guilty of murder and sentenced him to life in prison. This appeal timely followed.

## II. ISSUES PRESENTED

Appellant presents three issues for review. In his first issue, he contends that Bridget presented uncorroborated accomplice-witness testimony, and that after excluding this testimony, the remaining evidence is legally insufficient to support his conviction. In his second issue, appellant asserts that the evidence is factually insufficient to support his conviction. Appellant contends in his third issue that the trial court erred in submitting a jury charge which did not require unanimity regarding whether he (a) intentionally and knowingly caused Anna's death or (b) intended to cause Anna serious bodily injury and caused her death by committing an act clearly dangerous to human life.

## III. ANALYSIS

### A. The Accomplice–Witness Rule

Because appellant's first two issues rely on the application of the accomplice-witness rule, we begin by reviewing the governing law regarding accomplice testimony.

An accomplice is an individual who participates with a defendant before, during, or after the crime and acts with the requisite culpable mental state. *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim.App.2006). Thus, a witness is an accomplice to the crime for which the defendant is on trial if there is sufficient evidence in the record to charge the witness with the same or a lesser-included offense. *Blake v. State*, 971 S.W.2d 451, 454–55 (Tex.Crim.App.1998) (en banc). Whether the witness is actually charged with such an offense is irrelevant. *Id.* If there is no doubt or the evidence clearly shows that the witness is an accomplice as a matter of law, then the court must instruct to jury to disregard the witness's testimony unless other evidence tends to connect the defendant to the crime. *See* Tex.Code Crim. Proc. Ann. art. 38.14 (Vernon 2006); *Blake*, 971 S.W.2d at 455. But if the evidence as to a witness status as an accomplice is conflicting, the jury should determine the witness's status under instructions defining an "accomplice." *Blake*, 971 S.W.2d at 455.

The determination that a witness is an accomplice has important implications. Under the accomplice-witness rule, a defendant cannot be convicted based on the testimony of an accomplice unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed. Tex.Code Crim. Proc. Ann. art. 38.14 (Vernon 2006). Although appellant casts his challenges to the evidence under general legal and factual sufficiency standards, a challenge of insufficient corroboration is not the same as a challenge of insufficient evidence to support the verdict, but is instead governed by a different test. *Cathey v. State*, 992

was completed by Dr. Pustilnik, who testified that the exact time of death could not be

determined, this entry is an apparent mistake.

S.W.2d 460, 462–63 (Tex.Crim.App.1999) (en banc); *Torres v. State*, 137 S.W.3d 191, 196 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (citing *Cantelon v. State*, 85 S.W.3d 457, 460 (Tex.App.-Austin 2002, no pet.)).

To determine whether sufficient corroboration exists, we first eliminate the accomplice witness's testimony from consideration and then determine whether any of the remaining evidence tends to connect the accused with the commission of the crime. *Longoria v. State*, 154 S.W.3d 747, 758 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd). The corroborating evidence need not be sufficient in itself to establish guilt, nor must it directly link the accused to the commission of the offense. *Id.* Rather, the accomplice-witness rule is satisfied if there is some non-accomplice evidence that tends to connect the accused to the commission of the offense alleged in the indictment. *Id.*

In analyzing a challenge to the sufficiency of corroborative evidence, courts view the evidence in the light most favorable to the jury's verdict and determine whether a reasonable jury could conclude that the non-accomplice evidence, taken as a whole, tends to connect the appellant to the offense. *Gill v. State*, 873 S.W.2d 45, 48 (Tex.Crim.App.1994) (en banc). Taken in isolation, suspicious circumstances such as the accused's presence at the scene of the crime, motive, or opportunity to commit the crime are not by themselves sufficient to corroborate the testimony of an accomplice witness. *See id.* at 49; *Jeffery v. State*, 169 S.W.3d 439, 447 (Tex.App.-Texarkana 2005, pet. ref'd). But cumulative suspicious circumstances may tend to connect the accused to the charged offense, even if none of the circumstances is individually sufficient to do so. *Gill*, 873 S.W.2d at 49. Viewed collectively, even otherwise insignificant incrimi-

nating circumstances may tend to connect a defendant to a crime he is accused of committing. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex.Crim.App.1996). Accordingly, we look to all of the facts and circumstances in evidence to supply the necessary corroboration. *Moore v. State*, 700 S.W.2d 193, 203 (Tex.Crim.App.1985) (en banc). We then examine "the combined and cumulative weight of the evidence" in determining whether the accomplice testimony was corroborated. *Cox v. State*, 830 S.W.2d 609, 611–12 (Tex.Crim.App.1992) (en banc).

Appellant relies on this test to argue that he should be acquitted because Bridget is an accomplice and there is insufficient corroborating evidence to support her testimony. However, before we may apply this test, we must first determine whether Bridget is an accomplice.

## B. Complicity as a Matter of Law

In arguing that Bridget is an accomplice, appellant relies solely on the undisputed fact that she pleaded guilty to the offense of injury to a child. Citing this court's decision in *Paz v. State*,[4] appellant contends that injury to a child is a lesser-included offense to the crime of murder. Thus, he asserts that Bridget is an accomplice as a matter of law.

But appellant's reliance on *Paz* is misplaced. In *Paz*, we addressed the question of whether a defendant charged with capital murder for intentionally or knowingly causing the death of child under the age of six should have received a jury instruction on the lesser-included offense of injury to a child. Injury to a child can be a lesser-included offense of capital murder when certain other conditions are met; this occurs, as in *Paz*, when the victim is under the age of six. *Compare* TEX. PENAL

**4.** 44 S.W.3d 98, 101 (Tex.App.-Houston [14th   Dist.] 2001, pet. dism'd).

CODE ANN. §§ 19.03(a)(8) (making murder of a person under the age of six a capital offense) *with id.* § 22.04(c)(1) (defining a child, as used in the offense of "injury to a child," as a person under age fourteen) (Vernon 2006). Here, however, appellant was charged with and convicted of murder, not capital murder. Injury to a child is not a lesser-included offense of murder. *Ex parte Easter,* 615 S.W.2d 719, 721 (Tex. Crim.App.1981) (en banc); *Florio v. State,* 814 S.W.2d 778, 783 (Tex.App.-Houston [14th Dist.] 1991), *aff'd on other grounds,* 845 S.W.2d 849 (Tex.Crim.App.1992) (en banc). We must therefore reject appellant's argument that, because Bridget admits her guilt for the offense of injury to a child, she is an accomplice as a matter of law.

## C. Complicity as a Matter of Fact

Appellant also suggests that, in addition to being an accomplice as a matter of law because she pleaded guilty to the offense of injury to a child, Bridget is also an accomplice as a matter of fact. This issue was submitted to the jury by the following instructions:

Upon the law of accomplice witness testimony, you are instructed that a person, who has participated with someone else before, during or after the commission of a crime, is an accomplice witness. In such a case, there must be some evidence of an affirmative act on the witness's part, to assist in commission of the offense. If the witness cannot be prosecuted for the offense with which the accused is charged, then the witness is not an accomplice as a matter of law. A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even concealed it. The witness's presence at the scene of the crime does not render that witness an accomplice witness.

Now, if you find from the evidence that Bridget Farmer was an accomplice, then you are further instructed that you cannot convict the defendant upon Bridget Farmer's testimony, unless you first believe her testimony is true and shows the guilt of the defendant as charged in the indictment, and then you cannot convict the defendant unless Bridget Farmer's testimony is corroborated by other evidence tending to connect the defendant with the offense charged. The corroboration is not sufficient if it merely shows the commission of an offense, but it must tend to connect the defendant with its commission, and then from all the evidence, you must believe beyond a reasonable doubt with [sic] the defendant is guilty of the offense charged against him, or if you have reasonable doubt thereof, you will acquit the defendant.

Therefore, the jury could have arrived at its guilty verdict by finding that (1) Bridget was not an accomplice as a matter of fact, and the evidence, including her testimony, established appellant's guilt; (2) Bridget was an accomplice and her testimony was both true and corroborated by other evidence tending to connect appellant to the offense; or (3) Bridget was an accomplice, and although her testimony was not both true and corroborated, the remaining evidence established appellant's guilt.

From this record, we cannot say what path led the jury to convict appellant, but we will not reverse the judgment if any one of these paths is supported by the record. We note first that, despite his insistence that Bridget is an accomplice as a matter of law, appellant does not contend that the trial court erred in charging the jury to determine whether Bridget was an accomplice as a matter of fact. Moreover, we cannot agree with appellant's implication that it would have been error for the jury to determine that Bridget was not an accomplice. *See Blake,* 971 S.W.2d at 455

("If the evidence is conflicting, it is proper to leave the question of whether an inculpatory witness is an accomplice witness as a matter of fact to the jury under instructions defining the term accomplice."). For example, a reasonable jury could have found that Bridget did not participate in Anna's murder, or did not do so with the required intent. *See Cocke*, 201 S.W.3d at 748 (defining an accomplice as "an individual who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental state."); *Jarnigan v. State*, 57 S.W.3d 76, 87 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd) (stating that "the jury can infer knowledge and intent from ... acts, words, and conduct....").[5] Thus, the jury could have concluded that Bridget is not appellant's accomplice and considered her testimony without regard to whether it was corroborated.

█ Even if one assumes that the jury *found Bridget to be an accomplice,* her testimony is amply corroborated. P.W. testified that appellant threatened to kill Anna weekly or even daily. This evidence supports an inference that appellant intended to kill Anna. *See Ross v. State*, 133 S.W.3d 618, 621 (Tex.Crim.App.2004) (considering evidence that the appellant threatened a person as evidence of his intent to murder that person). Anna's body was subsequently found in appellant's trailer in the same room where, according

to P.W., appellant kept Anna locked up. P.W. also testified that she had previously heard banging noises from that room when appellant was in the room with Anna, and the medical examiner reported forensic signs that Anna had been repeatedly beaten. This evidence, when considered with the additional evidence discussed in this section, supports an inference that appellant had previously performed the same wrongful conduct (beating Anna with an unknown object) in the same location where Anna's body was later found. These circumstances tend to connect appellant to her murder. *See Rogers v. State*, 183 S.W.3d 853, 864 (Tex.App.-Tyler 2005, no pet.) ("In a prosecution for murder, evidence of prior assaults on and threats toward the victim by the defendant is relevant to show the defendant's previous relationship with the victim as well as the defendant's state of mind at the time of the offense.").

The evidence also placed appellant at the scene at or near the time Anna was fatally injured. For example, appellant's witnesses agreed that Anna had been dead for some time before emergency personnel arrived at appellant's residence at approximately 3:30 a.m. on December 29, 2003. By this time, her body was cold, blood had begun pooling on the side of her body closest to the ground, and rigor mortis had set in. Based on this evidence, a reason-

---

**5.** Appellant asked the trial court to charge the jury regarding the law of criminal responsibility under Texas Penal Code sections 7.02(a)(2) (making one a party if the person, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense") and (a)(3) (making one with a duty to prevent the offense a party if that person, "acting with intent to promote or assist its commission, ... fails to make a reasonable effort to prevent commission of the offense") (Vernon 2006). The trial court instead charged the

jury that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor was clearly insufficient." *See* Tex. Penal Code Ann. § 6.04(a) (Vernon 2003) (defining the level of causation required for criminal responsibility). Appellant does not argue that the trial court erred in submitting this definition of criminal responsibility or in failing to submit his proposed instruction.

able jury could infer that Anna died on December 28, 2003. In addition, the medical examiner testified that Anna died as a result of blows she received as many as forty-eight hours before her death. A reasonable jury could find, based on this evidence, that Anna was fatally injured as early as December 26, 2003. This is the same day that P.W. left appellant's residence to visit her biological father. According to P.W., appellant and Anna were both at the residence before she left. Consequently, this evidence, considered in conjunction with the other suspicious circumstances, tends to connect appellant to Anna's murder. *See Brown v. State,* 672 S.W.2d 487, 489 (Tex.Crim.App.1984) (en banc) (holding that, when combined with other suspicious circumstances, evidence of an appellant's presence at the crime scene near the time of the offense can corroborate accomplice testimony).

■ The evidence also shows that the day after Anna's death was reported, appellant checked into a motel hundreds of miles away using a false name and address. Evidence of flight and using a false identity to rent a motel room each reflect an appellant's consciousness of guilt for the charged offense. *See Bigby v. State,* 892 S.W.2d 864, 884 (Tex.Crim.App.1994) (en banc) (stating that evidence of flight "shows a consciousness of guilt of the crime for which the defendant is on trial."); *Robinson v. State,* No. 01–05–00622–CR, 2007 WL 491181, at *6–7, —— S.W.3d ——, at ——–—— (Tex.App.-Houston [1st Dist.] Feb. 15, 2007, no pet. h.) (discussing flight and use of an assumed name). Here, the evidence supports an inference that appellant fled the area and concealed his identity after Anna's death in an attempt to avoid arrest.

Viewing all of the foregoing evidence in the light most favorable to the jury's verdict, we conclude that a reasonable jury, if required to do so, could find that the cumulative effect of the non-accomplice evidence tends to connect appellant to Anna's murder. We therefore overrule appellant's first issue.

## D. Factual Sufficiency

■ In his second issue, appellant challenges the factual sufficiency of the evidence to support his conviction. When reviewing the factual sufficiency of the evidence, we view all the evidence in a neutral light and set aside the verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997) (en banc) (quoting *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996) (en banc)). Before we may reverse for factual insufficiency, we must first be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Watson v. State,* 204 S.W.3d 404, 417 (Tex.Crim.App. 2006). When reviewing the evidence, we must avoid intruding on the factfinder's role as the sole judge of the weight and credibility of the witness testimony. *Johnson v. State,* 23 S.W.3d 1, 9 (Tex.Crim.App. 2000) (en banc). We do not re-evaluate the credibility of witnesses or the weight of evidence, and will not substitute our judgment for that of the factfinder. *Johnson v. State,* 967 S.W.2d 410, 412 (Tex. Crim.App.1998).

Appellant primarily argues that the evidence is factually insufficient if Bridget Farmer's testimony is excluded; however, for the reasons discussed above, the jury was entitled to consider her testimony. He next contends that the jurors' deliberations were so clouded with emotion that they failed to consider all the evidence, but cites no evidence that the jury neglected to consider.

Appellant also argues that no witnesses from the flea market or the neighborhood testified to seeing Anna with him. Because no such evidence was required, its absence does not undermine the verdict. Referring to P.W., appellant complains that some of the evidence consisted of testimony provided by an eleven-year-old child regarding events that occurred when she was nine; he also asserts that Bridget had an incentive to lie. But appellant does not argue that P.W. and Bridget were not competent to testify, or that the jury was unaware of P.W.'s age or Bridget's possible motivations. We will not reevaluate the jury's credibility determinations.

Appellant also refers to P.W.'s testimony that Bridget "smacked" Anna "kind of not hard, but kind of hard" as evidence contrary to the verdict. This testimony is taken out of context, and is not inconsistent with the verdict. In fact, P.W. testified that Bridget "only smacked Anna a couple of times" but "[appellant] would say she wouldn't do it hard enough." Similarly, appellant refers to evidence that Bridget delayed calling 911 and initially lied to first responders regarding the time she discovered Anna's death, but ignores Bridget's testimony that she did so at appellant's request to give him a "head start" in avoiding arrest.

Appellant next contends that the testimony of his former brother-in-law, William Cowley, is contrary to the verdict. Cowley testified that in August 2002, he observed Bridget, Anna, and P.W. at a family barbeque. According to Cowley, he asked the two girls if they wanted more food, and when they said they did, Bridget "slapped both of them upside the head at the same time and told them, no, they didn't need anything more to eat." At most, this testimony demonstrates that, when not acting under appellant's direction, Bridget treated both daughters equally, if badly; in contrast, the cumulative and uncontroverted evidence presented at trial by Bridget, P.W., and the medical examiner establishes that Anna was subsequently singled out for horrific abuse. Although Cowley's observation may support an inference that Bridget was a poor parent, this fact is not in dispute: Bridget admitted as much by pleading guilty to two counts of injury to a child. Moreover, Cowley's testimony is not inconsistent with a jury finding that, seventeen months after this incident, Bridget's husband murdered Anna.

Having reviewed the record in a neutral light, we conclude the evidence is factually sufficient to support the verdict. P.W.'s testimony places appellant and Anna at the location where her body was found, at or near the time that Anna's fatal wounds were inflicted. P.W.'s additional testimony that appellant frequently threatened to kill Anna is evidence of his intent to murder her. Additionally, appellant wrote the trial court a letter in which he described Anna's death as "an accident," thereby implying that he had knowledge of the events surrounding Anna's death.[6] This evidence is consistent with even stronger evidence found in Bridget's testimony. According to Bridget, appellant told her immediately after Anna's death that "[i]t must have been something he did the day before." Finally, the jury's verdict is further supported by Bridget's testimony and corroborative testimony, both of which we have already described in some detail.

Although proof of motive or of a request for forgiveness is not required, these are also significant circumstances indicating guilt. See Guevara v. State, 152 S.W.3d 45, 50 (Tex.Crim.App.2004) ("Motive is a significant circumstance indicating guilt. Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant.") Such addi-

---

**6.** Although the letter implies that appellant did not act with a culpable mental state, appellant was not required to present such evidence at trial and did not do so.

tional evidence can be found in a letter that appellant wrote to Bridget from jail less than three weeks after his arrest. In this letter, appellant wrote, "Now please, I beg of you, cry, yell, scream, pray. Do whatever it takes to get the unforgiveness out of your heart. Unforgiveness can only cause disaster and death." He also wrote that Anna "in her *right* mind, befor[e] the devil started tormenting her *and* I, would not want things the way they now are." Appellant continued:

> "The devil just deceived us little [by] little until now Anna is gone.... [God] wants to heal your heart and help you deal with the pain & sorrow. But you must forgive first.... I always thought that if something ever happened I could count on my wife to search her heart and tell truthfully how things where [sic]. That's why I always wanted you as a witness. Now your [sic] trying to cover this up and make me out to be a monster.... We were not bad parents. Just frustrated, confused, and deceived by Satan.... Please (Perdo' name) (Forgive me) Judy, Mammaw, Kari,[7] and Anna. I am sorry for everything [.] Please forgive me[.]"

Viewing the evidence in a neutral light, we conclude that the jury's verdict is not contrary to the great weight of the evidence, and we overrule appellant's second issue.

## E. Jury Unanimity

■■■ In his third issue, appellant contends the trial court erroneously failed to require jury unanimity. In his written objection to the charge, appellant requested an instruction requiring jury unanimity as to whether he committed murder by (a) intentionally or knowingly causing Anna's death, or (b) intending to cause serious bodily injury and committing an act clearly dangerous to human life that caused Anna's death. *Compare* Tex. Penal Code Ann. § 19.02(b)(1) (defining murder as intentionally or knowingly causing death) *with id.* § 19.02(b)(2) (defining murder as causing death by committing an act clearly dangerous to human life with the intent to cause serious bodily injury).

■■■ We begin review of a jury unanimity challenge by examining the language of the statute to determine the elements of the crime and whether the legislature has created a single offense with multiple or alternate methods of commission. *Jefferson v. State*, 189 S.W.3d 305, 311 (Tex.Crim.App.2006). While jury unanimity is required on the essential elements of an offense, the jury generally is not required to return a unanimous verdict on the specific method of committing a single offense. *Id.; see also Ngo v. State,* 175 S.W.3d 738, 747 n. 32 (Tex. Crim.App.2005) (en banc).

Here, the statute under which appellant was convicted does not describe different offenses, but merely sets forth different methods of committing the same offense. *See Aguirre v. State*, 732 S.W.2d 320, 326 (Tex.Crim.App.1987) (en banc) (op. on reh'g). Although sections 19.02(b)(1) and (b)(2) differ in their descriptions of the mental state required for culpability, jurors are not required to agree on the defendant's specific mental state; rather, they need only agree that the defendant possessed one of the alternate mental states that satisfy the element of intent under the statute. *See Jefferson,* 189 S.W.3d at 313 (holding that a jury need not agree on the method of committing an offense where the different possibilities each "involve[d] the same injury to the

---

**7.** Judy is Bridget's mother. The identities of "Mammaw" and Kari are not indicated in the record.

same child during the same transaction with a similar level of culpability."); *see also Barfield v. State,* 202 S.W.3d 912, 916 (Tex.App.-Texarkana 2006, pet. ref'd) (holding that a general verdict is appropriate when the jury can convict under § 19.02(b)(1) or (b)(2)). We therefore overrule appellant's third issue.

## IV. CONCLUSION

Having overruled each of appellant's issues, we affirm the judgment of the trial court.