**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00331-CR**
_____

**GERALD TOMLINSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 356th District Court**
**Hardin County, Texas**
**Trial Cause No. 25070**

**MEMORANDUM OPINION**

Charlie Daniel Jr. died from gunshot wounds he received on November 2, 2018. A grand jury indicted Appellant Gerald Wade Tomlinson for "intentionally and/or knowingly caus[ing] the death of [] Charlie Daniel, Jr., by discharging a firearm in the direction of the said Charlie Daniel, Jr." Tomlinson pleaded "not guilty," and a jury found Tomlinson guilty of murder and assessed punishment at fifteen years of confinement. *See* Tex. Penal Code Ann. § 19.02. Tomlinson appealed, and in two issues he challenges his conviction. We affirm.

1

State's Case in Chief

Testimony of Katherine Parker

Katherine Parker testified that she is the dispatch supervisor in the Hardin County Sheriff's Office, and she receives 911 calls. Parker identified State's Exhibit 1 as a recording of a 911 call from November 2, 2018, pertaining to the case against Tomlinson, and the recording was published to the jury.

In the recording, the caller identifies herself as Connie Lindsey with Basil Oilfield Services, and she reported that a woman named Jacklyn Sanders was in the Basil office with a gunshot wound to her leg. Lindsey told the 911 dispatcher that Sanders said her friend, Charlie Daniel, who was coming to pick her up, was shot twice and was still in his truck. The dispatcher asked who shot them, Lindsey asked Sanders, and Sanders replied, "Wade Tomlinson."

Testimony of Sergeant Grant McDowell

Sergeant Grant McDowell, with the patrol division of the Hardin County Sheriff's Office, testified that on November 2, 2018, he was dispatched to Basil Oilfield Service in Saratoga about 3:30 p.m. When he arrived, another deputy was already on the scene, and first responders were tending to a woman with a gunshot wound. McDowell and Deputy Leviner went to the Tomlinson residence nearby on Cotton Road, he helped secure the scene where people had arrived, and he checked inside the residence, but he did not find Tomlinson inside. McDowell found a work

truck with "a deceased individual in the passenger side -- half in, half out." A while later, dispatch advised that Tomlinson's vehicle had been located at a residence on Flowers Drive. McDowell went to the location on Flowers Drive about two hours after the initial call, he agreed he wore a body camera, and a recording from his body camera was admitted as State's Exhibit 3 and published to the jury. McDowell testified he found Tomlinson in the house, on the floor, and covered with a blanket. On cross-examination, McDowell testified that he had not dealt with Tomlinson before this incident, McDowell thought Tomlinson sounded "apologetic" after he was handcuffed, and McDowell recalled that Tomlinson said he "told her not to bring anyone else to his property[.]"

In the bodycam video, Tomlinson tells McDowell that he had been robbed four times since February losing about $12,000 worth of property, but because his son was the legal owner of the property, law enforcement had told him his son needed to make the complaint about the thefts. Tomlinson also tells McDowell he did not know where his pistol was and "that girl had that pistol last time I saw her." Tomlinson also states, "I don't know how many times I shot[,]" and "she got hit in the crossfire." Tomlinson states "that guy" came at him with a pipe or a piece of metal, and Tomlinson told him to "get in his truck and get the h--- off my property." Tomlinson tells McDowell "I had every intention of turning myself in as soon as I could get an attorney," and that he was at the house on Flowers Street "to hide out"

3

until he could contact an attorney because he could not find his phone. He also tells McDowell, "I'm not even supposed to have a gun, my son loaned me that gun."

Testimony of Kendra Simmons

Kendra Simmons testified that she is an investigator with the Hardin County Sheriff's Office, and she was assigned as the lead investigator in this case. Simmons responded to a call where she found Jacklyn Sanders, who was bloody, upset, and excited. Sanders had already been treated and had her leg bandaged, and she was later taken to the hospital by helicopter. Sanders said she was shot closer to Tomlinson's house and that a second victim was shot in a vehicle. After Sanders was transported to the hospital, Simmons went to an RV on Tomlinson Road off Cotton Road where Tomlinson lived, and she then prepared two sketches of the area, which were drawn and measured by Simmons. The sketches were admitted as State's Exhibits 6 and 7. Charlie Daniel was deceased when Simmons arrived at the property. Simmons also testified that the sketches depicted where Simmons found shell casings in front of and next to the truck as well as "blood and flesh" in front of the truck. Simmons agreed that the photograph in State's Exhibit 21 depicts Daniel "falling out of the truck[,]" and she testified that Daniel was moved to the ground, as depicted in Exhibit 22, after the Justice of the Peace had arrived at the scene. She also testified that Exhibits 21 and 22 depict Daniel holding a metal pipe in his right hand, and she included that detail in her report. Simmons testified that the

4

photographs in State's Exhibits 22 through 24 show four bullet wounds on Daniel that went "through and through." She also agreed that she took photographs of the autopsy, and the photographs show bullet wounds to Daniel.

Testimony of Jacklyn Sanders

Sanders identified the defendant as Wade Tomlinson, and she testified that he was a friend. She testified that she cleaned his house and washed his clothes, and she lived at Tomlinson's house twice. She also testified that she knew Charlie Daniel Jr., who was her boyfriend and her best friend. She and Daniel had been together for about a year, then broke up, and got back together the day before the incident, but a few days before the incident, she had been sleeping in a cemetery.

Sanders testified that Tomlinson lived in a camper trailer and had a washer, dryer, and refrigerator in another building on the property. Sanders recalled that on November 2, 2018, she was doing Tomlinson's laundry and the incident occurred as she was carrying Tomlinson's clothes from the dryer into the home. Sanders testified that she and Daniel had gotten back together, and the night before the incident she had stayed with Daniel. She was going to move in with him, and Daniel had come to pick up her things from Tomlinson's camper. Sanders recalled that Tomlinson had told her "[d]on't bring anybody on my property[,]" so Daniel had to drop her off while she did Tomlinson's laundry and she packed. Sanders testified that State's Exhibit 35 was a copy of texts and messages between Sanders and Tomlinson,

5

including a text she sent to Tomlinson on November 2, 2018, that said "Hello, friend. Are you awake yet? I'm on my way[,]" and the exhibit also showed that she missed a call from Tomlinson "seconds before[]" that text.

Sanders recalled that when Daniel arrived, he cut off the engine and parked at the end of the road because no one was allowed on Tomlinson's property. She had completed Tomlinson's laundry, and she had packed her drawing books, clothes, and shoes and had them sitting in front of the washroom. As she walked out of the washroom, she saw Tomlinson walking back up the road from where Daniel's truck was parked. She then saw Tomlinson walking towards her, she noticed Tomlinson had a gun, and she froze. Even though Tomlinson knew Daniel was coming to pick up Sanders, Tomlinson asked her, "Is that guy down there to rob me? Are y'all setting me up? You're going to steal all my stuff. [] You're not leaving. You're not going nowhere."

Sanders told Tomlinson to put down the gun and said she was leaving, but Tomlinson told her to turn around and put her hands behind her back. Sanders did not turn around, she told him she was not going to let him shoot her in the back, and then he shot her in the leg. Sanders heard the truck start, she knew Daniel was coming to get her because he had heard the gunshot, and as soon as she saw Daniel's truck, she told Daniel to stop. Daniel stayed in the truck, and Sanders got in on the passenger side, but Tomlinson opened the door on Daniel's side, Daniel did not say

6

anything, and he kept his hands on the steering wheel. Daniel told her to run, so she jumped out of the truck and ran. Sanders testified that she saw Daniel get shot twice: he was shot once in the stomach, when his hands were still on the steering wheel, and again in his chest, and that shot also hit Sanders in the shoulder.

Sanders thought that Tomlinson knew what he was doing, and his actions were intentional and planned. According to Sanders:

> He was standing in the door. The door was open. [Tomlinson] was standing in the door outside the truck with the gun about 12 inches from Charlie's side, still telling me I'm not leaving. . . .
> . . . .
> Why shoot Charlie? How are you going to argue with me that I'm not leaving, and you kill a man who doesn't take his hands off the steering wheel, never says a word to him, not even an aggressive gesture. He doesn't get loud with him. No attitude. He never said a word to that man.

The first call for help occurred when Sanders got to the Basil Oil Company office. Sanders identified State's Exhibit 27 as a photograph of the front of her legs on the day of the incident and State's Exhibit 36 as a photograph of her about half a mile from Tomlinson's house, at the Basil Oil Company office.

Sanders denied that she or anyone took any of Tomlinson's property, and she denied seeing a pipe in Daniel's hand when she got out of the truck. According to Sanders, Daniel did not know Tomlinson and had not ever been to Tomlinson's property. On cross-examination, Sanders agreed that she had told Tomlinson on October 30 that she was "tired of living this way[,]" that Tomlinson had kicked her

7

out, and she knew she was pregnant by her current boyfriend at that time. Sanders agreed she was aware that Tomlinson had had problems with people stealing from him, but she said she had never stolen from him. Sanders testified she had not fought or argued with Tomlinson that day, but she testified that Tomlinson was aware that she had been texting and calling Daniel, and Tomlinson knew that Daniel was coming to pick her up.

According to Sanders, she had prior criminal convictions in other counties for abandoning a child with intent to return, for credit card abuse, and for misdemeanor theft. Sanders agreed she used to "smoke dope[,]" but she stated she did not smoke it anymore, since the incident.

Testimony of Dennis Allen

Dennis Allen testified that he works in criminal investigations for the Hardin County Sheriff's Office, and he was formerly the Chief of Police in Silsbee. Allen agreed that he had interviewed Tomlinson at the Sheriff's Office in Kountze, the interview was recorded, and he identified State's Exhibit 37 as a recording of his interview with Tomlinson. According to Allen, during his interview of Tomlinson, Tomlinson said he was an old man, and he did not want "to get his ass kicked."

Allen agreed that people use pipes to hurt other people, but not typically in a vehicle because it would require swinging or hitting. According to Allen, when a person dies while they are clutching something, the grip becomes very firm due to

rigor—a "death grip[,]"—and the item being clutched must be pried away. Allen did not find any rigor when he checked Daniel at the scene. Allen testified that he observed a pipe in Daniel's hand and, in Allen's opinion, "it was enough room in between the fingers and the thumb [that] the pipe could have been placed in that hand. . . . It was an open grip. It was not a clinch[.]" On cross-examination, Allen testified that in a traumatic death, muscles would constrict and close, and he agreed that a pipe could be used as a deadly weapon. Allen testified that he did not take any fingerprints from the pipe.

Allen agreed that four nine-millimeter shell casings were found at the scene that were consistent with the wounds he observed and that would have been fired by a semi-automatic pistol. Allen also testified that Daniel's truck was a work truck that had a console that sits a little higher than normal, so that "if you were going to crawl out from the driver's side to the passenger side, you would have to go up and over to get out the other side of the door. You couldn't just slide across." On cross-examination, Allen would not agree that if Daniel had been reaching for a pipe, it would be a threatening situation to a person approaching him, and Allen added, "you don't take a pipe to a gun fight[.]"

Testimony of Dr. John Wayne

Dr. John Wayne is a forensic pathologist employed by Diagnostic Pathology Services in Beaumont, and he performed the autopsy on Charlie Daniel Jr. Wayne

testified that Daniel had three gunshot wounds. One entered his left arm, went through his chest, and came to rest on the right side of his ribs. Another went in his back, just above his gluteus, went through his chest, and rested inside the chest cavity. A third entered below his left armpit, crossed the chest cavity, went through his heart, and exited. Dr. Wayne determined that the cause of death was gunshot wounds. On cross-examination, Wayne agreed that a toxicology analysis showed the presence of methamphetamines and another substance. Wayne testified that rigor mortis—stiffening of the body's musculature—may start as early as an hour after death or as late as twelve to eighteen hours after death, and heat and humidity and the presence of a stimulant (such as cocaine or methamphetamine) can accelerate the process.

Defense Witnesses

Testimony of Tina Flowers

Tina Flowers testified that she is Tomlinson's friend and she had known Tomlinson for a couple of months at the time of the incident. Flowers agreed that Tomlinson was found at her home on the day of the incident, but she was not home, and she was out shopping at the time he arrived. She returned home from shopping and saw Tomlinson on the back porch, and he was "upset[]" and was saying "I've got to get ahold of my lawyer. I've got to turn myself in." According to Flowers, Tomlinson asked her not to tell the police he was at her home, and he told her he had

shot someone on his property who was "coming at him." Flowers testified that she told him he needed to turn himself in.

Testimony of Lynette Vann

Vann testified that she had known Tomlinson since she was a teenager, and she was at Flowers's house on the day of the incident. According to Vann, Tomlinson looked "very scared," he told her he had just shot someone, he was trying to defend himself from someone who had a metal pipe, and "he didn't want to have to do what he did." On cross-examination, Vann agreed that she was at Flowers's house when Tomlinson arrived, but that Flowers's son was not there, and no one else was at the house but Tomlinson. Vann agreed she lied to the police about Tomlinson leaving in a white truck because she was scared and was trying to help Tomlinson find a lawyer before the police took him away. According to Vann, Tomlinson went to Flowers's house because he did not have a phone, and he wanted a lawyer before he turned himself in. Vann testified that her phone was not "in service" that day. When asked whether Tomlinson had sought out the police to tell them he had to kill someone in self-defense, Vann responded "You don't have to. It's a small town." Vann agreed that it took the police about an hour and a half to find Tomlinson, and when the police arrived, Tomlinson did not tell them what happened because he "was probably terrified."

Testimony of Angela Collier

Angela Collier testified that, at the time of the incident, she worked at a store in Saratoga, and she knew Tomlinson because he often came in for breakfast. Collier agreed that she talked with Tomlinson a few days before the incident, and she got the impression he was concerned and apprehensive about a woman who was staying at the cemetery. Collier testified that she advised Tomlinson not to go to the cemetery, that it was not safe. Collier thought Tomlinson was "very nice [and] very considerate," and she got the idea that Tomlinson wanted to help the woman.

Testimony of Deputy James Tinnier

Deputy James Tinnier testified that he is a patrol deputy for the Hardin County Sheriff's Office, and on the day of the incident he went to the Basil office, where he talked with Jacklyn Sanders after Sanders had spoken with Connie Lindsey. Tinnier could not remember who was shot first.

Testimony of Deputy Zachary Leviner

Deputy Zachary Leviner with the Hardin County Sheriff's Office testified that he went to the scene of the incident with Sergeant McDowell. According to Leviner, a constable and some first responders were present when they arrived. As they arrived, Leviner saw a truck parked, the passenger-side door open, "[a] white male hanging out the passenger side. Bottom half of, I guess you'd say, his legs were in the vehicle and torso on the ground[,]" and the man had a pipe in his right hand.

12

Leviner recalled that the truck was running at the time. Leviner also recalled seeing shell casings and blood droplets on the ground, but they did not find any guns. When asked about his report, Leviner did not recall that the report said one shell casing was white and two were yellow, but he did not dispute it.[1] Leviner agreed that the deceased was Charlie Daniel.

Testimony of Kendra Simmons

Simmons agreed that a bag that was found in Daniel's truck belonged to Jacklyn Sanders, and it contained a pill bottle, "spiral notebooks, miscellaneous paperwork, things like that[,]" but she did not recall clothes being in the bag. The bag was introduced into evidence as Defense Exhibit 2, and Simmons testified that the pill bottle was a prescription for Codeine Number 3 for Gerald Tomlinson, and there were also unopened bags of syringes in the bag. Simmons examined other bags of evidence, and she testified that they contained nine caliber shell casings—one was silver, and the others were brass. Simmons denied finding any white shell casings at the scene. On cross-examination, Simmons testified that Sanders told her that

---

[1] On rebuttal, Leviner examined four shell casings in evidence, and he testified that one was "white metal" and the others were "yellow metal." Leviner agreed that some people would call the white metal "silver," but "white" and "yellow" refer to colors, and "silver" and "gold" refer to the type of metal. He agreed that when he previously testified about finding a white shell casing, he was talking about a casing that was a "white metal color[.]"

Tomlinson had opened the driver's side door of the truck and that she was at the property to collect her clothing and to take a shower.

Testimony of Amanda Jacobs

Amanda Jacobs testified that she grew up with Jacklyn Sanders. On cross-examination, Jacobs testified that she once had a run-in with Sanders, and that Sanders was "not one of those [friends] you want to keep around. . . . She's trouble." On re-cross, Jacobs testified that Sanders stole her driver's license, and Jacobs also lost her credit cards.

Testimony of Connie Lindsey

Connie Lindsey testified she is employed by Basil Oilfield Services, and she was working there on November 2, 2018. She agreed she talked with the 911 dispatcher that day and that Sanders had told her "Charlie had been shot twice, and she had been shot once[.]" According to Lindsey, Sanders told her that Tomlinson had told her he did not want anyone on his property, so she told Daniel to meet her at the end of the road, where the Basil office is located, and she told him she would meet him there.

The defense filed a Motion for Instructed Verdict, arguing that the State failed to prove beyond a reasonable doubt that Tomlinson intentionally or knowingly caused Daniel's death. The defense also argued that the State was required to disprove Tomlinson's self-defense claim, and that it failed to prove beyond a

14

reasonable doubt that self-defense does not apply to Tomlinson's conduct. The court denied the motion. The jury found Tomlinson guilty of murder. After receiving additional evidence on punishment, the jury assessed punishment at fifteen years of confinement.

Sufficiency of the Evidence

In Appellant's first issue, he argues that the trial court erred by denying his motion for instructed verdict because of "the lack of legally sufficient evidence[.]" According to Appellant, the trial court improperly inferred that Appellant intended the results of his conduct, which denied Appellant the right to have each and every element of the indictment proved beyond a reasonable doubt.

We review the denial of a motion for instructed verdict under a sufficiency analysis. *See Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990) ("A challenge to the trial judge's ruling on a motion for an instructed verdict is in actuality a challenge to the sufficiency of the evidence to support the conviction.") Evidence is sufficient to support a conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). When reviewing the sufficiency of the evidence, we consider all the admitted evidence in the light most favorable to the verdict. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury is the sole judge of the credibility of

a witness's testimony and the weight to assign to that testimony. *Jackson*, 443 U.S. at 319; *Metcalf*, 597 S.W.3d at 855. The jury can believe all, some, or none of a witness's testimony. *Esquivel v. State*, 506 S.W.2d 613, 615 (Tex. Crim. App. 1974). Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 16-17. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

A person commits murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). "Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death." *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. Tex. Penal Code Ann. § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

In a homicide case, the defendant's state of mind is a question of fact for the jury to determine, and the jury may infer intent "from any facts in evidence which it

16

determines proves the existence of such intent to kill, such as the use of a deadly weapon." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967)). "It is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill." *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) (internal citations omitted). Intent to murder can be inferred from circumstantial evidence, such as a defendant's acts, words, and the extent of the victim's injuries. *See Ex parte Weinstein*, 421 S.W.3d 656, 668-69 (Tex. Crim. App. 2014). Evidence of flight reflects on a defendant's consciousness of guilt of the crime charged. *See Yost v. State*, 222 S.W.3d 865, 875 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) (en banc)).

Appellant's brief states that "[o]nce the issue of self-defense is raised, the State has the burden of proof beyond a reasonable doubt that the defendant did not act in self-defense[,]" citing to *Tidmore v. State*, 976 S.W.2d 724, 729 (Tex. App.—Tyler 1998, pet. ref'd). The issue of self-defense is for the jury to determine. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Where a defendant claims self-defense, the defendant bears the burden of production, which requires the production of some evidence that supports the defense. *See Zuliani v. State*, 97

17

S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing Tex. Penal Code Ann. § 2.03; *Saxton*, 804 S.W.2d at 914). Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the defense. *Id.* The State is not required to produce evidence that refutes the claim of self-defense, but it must prove its case beyond a reasonable doubt. *Id.* A jury is free to accept or reject the evidence on self-defense, and a jury verdict of guilty is an implicit finding against the defensive theory. *See id.*; *Saxton*, 804 S.W.2d at 914.

Appellant concedes that it is "undisputed that Appellant Shot Charlie Daniel, Jr., causing his death." Because the jury charge included an instruction on self-defense, yet the jury found Appellant guilty, the jury implicitly rejected Appellant's claims that he acted in self-defense. *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914. The jury could have inferred the requisite intent from Appellant's use of a deadly weapon. *See Brown*, 122 S.W.3d at 800. The jury could have disbelieved that Appellant "reasonably believe[d] the force [was] immediately necessary to protect the actor against the other[']s use or attempted use of unlawful force[,]" as the jury charge provided. The jury could have believed Sanders's testimony that Daniel's hands were on the steering wheel at all times. The jury, as sole factfinder, could have disbelieved statements Appellant made to Flowers and Vann that he was defending himself from someone who was "coming at him." The jury could also have inferred consciousness of guilt from the evidence that Appellant

18

fled the scene and hid under a blanket at Flowers's house. *See Bigby*, 892 S.W.2d at 884; *Yost*, 222 S.W.3d at 875.

"Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914. Having reviewed all the evidence in the light most favorable to the verdict, we conclude the jury rationally could have found each element of the offense beyond a reasonable doubt and could have rejected Appellant's claim of self-defense. We overrule Appellant's first issue.

Admission of Evidence

Appellant's second issue argues that the trial court erred in denying evidence of "a previous similar act of violence by the deceased after some evidence of aggression by the deceased against Appellant had been presented before the jury." According to Appellant, the evidence was relevant to show the deceased was the first aggressor by demonstrating his intent, motive, or state of mind.

At trial, defense counsel attempted to call a witness who would testify to a previous instance where Daniel "exited a vehicle with a shotgun and discharged the weapon[,]" striking the proposed witness, and for which Daniel was convicted of aggravated assault. Defense counsel asserted that the proffered testimony was being

offered to show a specific act where Daniel was the aggressor and would show the state of mind of the deceased. The defense also argued that there was evidence of an act of aggression by Daniel because he came onto Tomlinson's property when he had been told not to. Defense counsel argued that the witness's testimony was admissible under *Torres v. State*, 117 S.W.3d 891 (Tex. Crim. App. 2003). The State argued that *Torres* was distinguishable because the witness the defense sought to have testify in this case was not a witness to the shooting in 2018 for which Tomlinson was indicted and would not "be able to explain that on[e] person or the other was even [the] first aggressor." The trial court excluded the testimony and stated:

> Well, I've studied this. I know y'all studied this, and I also considered the balancing factors that are inherent in the ruling on admissibility as to the fact that this is an 18-year-old incident involving the deceased. Given my understanding of the Torres case and the application of 404, I do not think that it should come in, given all the circumstances.

We review a trial court's decision to admit extraneous offense evidence for an abuse of discretion. *See De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id.* at 343-44 (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005). If the trial court's decision is correct on any theory of law

applicable to the case, we will uphold the decision. *De La Paz*, 279 S.W.3d at 344; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). "Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against admitting evidence of extraneous offenses including 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Daggett v. State*, 187 S.W.3d 444, 451 n.13 (Tex. Crim. App. 2005) (quoting Tex. R. Evid. 404(b)) (emphasis omitted); *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). Even if evidence is admissible under Rule 404(b), it may still be inadmissible under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or needless presentation of cumulative evidence. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007); *see also* Tex. R. Evid. 403.

"The rules of evidence permit the defendant to offer evidence concerning the victim's character for violence or aggression on two separate theories when the defendant is charged with an assaultive offense[.]" *Ex parte Miller*, 330 S.W.3d 610, 618 (Tex. Crim. App. 2009).

> First, the defendant may offer reputation or opinion testimony or evidence of specific prior acts of violence by the victim to show the

21

"reasonableness of defendant's claim of apprehension of danger" from the victim. This is called "communicated character" because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not. This theory does not invoke Rule 404(a)(2) because Rule 404 bars character evidence only when offered to prove conduct in conformity, *i.e.*, that the victim acted in conformity with his violent character. . . .

Second, a defendant may offer evidence of the victim's character trait for violence to demonstrate that the victim was, in fact, the first aggressor. Rule 404(a)(2) is directly applicable to this theory and this use is called "uncommunicated character" evidence because it does not matter if the defendant was aware of the victim's violent character. The chain of logic is as follows: a witness testifies that the victim made an aggressive move against the defendant; another witness then testifies about the victim's character for violence, but he may do so only through reputation and opinion testimony under Rule 405(a).

*Id.* at 618-19 (internal footnotes omitted).

According to Appellant, *Torres v. State*, 117 S.W.3d 891 (Tex. Crim. App. 2003), is "remarkably similar to our case[.]" And, Appellant contends it supports his argument that the trial court erred in excluding the proffered testimony. In *Torres*, the defendant was convicted of the murder of Valdez. *Id.* at 893. Valdez had been in a relationship with Roxanne, and they lived in the home of Roxanne's aunt, Diane. *Id.* The relationship was turbulent, and Valdez and Roxanne broke up after Valdez assaulted Roxanne because he suspected she was seeing other men. *Id.* Roxanne went to stay with friends for a few days, during which time Torres learned from Roxanne that Valdez had assaulted her previously and Valdez was looking for Torres. *Id.* After Valdez moved out of the aunt's house, Roxanne moved back into

her aunt's house. *Id.* Torres then went to stay with Roxanne at her aunt's house, and Torres brought a gun with him. *Id.* at 893-94. Early one morning, Roxanne and Torres heard a noise outside, Roxanne saw Valdez climbing the balcony, and she went to her aunt's room to call 911. *Id.* at 894. While Roxanne was on the phone with the police, Torres shot and killed Valdez. *Id.*

Torres was tried for murder and claimed he acted in self-defense. *Id.* Both Roxanne and Diane were called to testify. *Id.* Roxanne testified that, on the morning of the murder, she saw Valdez climbing onto the balcony, shouted "It's him," and ran to her aunt's bedroom to call 911. *Id.* During Diane's testimony, the defense sought to introduce character evidence of Valdez through Diane to show that Valdez was the first aggressor, and the State objected. *Id.* During voir dire of Diane, she testified that two days before his death, Valdez had climbed through the second-story window in her bedroom and asked for Roxanne. *Id.* When Diane told him she did not know where Roxanne was, Valdez replied, "If you don't tell me I'm going to do something to you and your kids[,]" and Diane feared for her life. *Id.* The trial court excluded Diane's testimony, and Torres was convicted. *Id.* On appeal, the court of appeals affirmed the conviction. *Id.*

The Court of Criminal Appeals reversed, explaining that Diane's testimony tended to raise the issue of self-defense, the act of climbing to a second-story "uninvited and unannounced, at 6:30 a.m. constitutes an act of aggression[,]" the

23

behavior was similar to Valdez's behavior just prior to when he was shot, and Diane's testimony "is therefore appropriate to allow the appellant to introduce the previous act of climbing in the window and threatening Diane and her children because it may help clarify Valdez's purpose in climbing up the balcony[]" at the time the defendant shot him. *Id.* at 895. As stated in *Torres*, "such specific acts of violence are admissible only to the extent that they are relevant apart from showing character conformity." *Id.* at 894. The Court explained that:

> . . . specific, violent acts are relevant apart from showing character conformity in the context of proving that the deceased was the first aggressor by demonstrating the deceased's intent, motive, or state of mind. Because the specific act is probative of the deceased's state of mind or intent, the witness must know, but the defendant need not know of the act.

*Id.* at 894-95 (citations omitted).

We find *Torres* factually distinguishable. In *Torres*, the prior specific act of violence occurred only about a week before the crime for which Torres was prosecuted, and the testimony from Diane about the prior specific act was relevant and could "shed light on Valdez's motive in entering the apartment." *Id.* at 895-96. By contrast, in the case at bar, the proposed witness was offered to testify about a specific act that Daniel committed about eighteen years before the incident for which Tomlinson was prosecuted, and the proffered evidence did not show that the proposed witness's testimony would shed light on the victim's behavior or motive on the day that he was shot by Tomlinson. Appellant did not argue at trial and does

24

not argue on appeal that he was aware of the previous incident about which the witness would testify. Therefore, the testimony could not have been offered as "communicated character" evidence, which requires the defendant to be "aware of the victim's violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not." *See Miller*, 330 S.W.3d at 618. Rather, Appellant contends that the witness's testimony was relevant to the issue of who was the first aggressor in the confrontation between Daniel and Tomlinson—to introduce the testimony as "uncommunicated character" evidence. *See id.* at 619. Tomlinson was not entitled to use the proffered specific act of prior violence to show that Daniel was the first aggressor on the day he was shot. *See id.* at 620. Such use is an attempt to prove Daniel's conduct in conformity with his allegedly violent character and is prohibited by rules 404(a) and 405(a). *See id.*[2] Therefore, we cannot say that the trial court abused its discretion in excluding the proffered testimony. We overrule Appellant's second issue.

Having overruled both of Appellant's issues, we affirm the trial court's judgment.

---

[2] *See also Hawthorne v. State*, No. 09-10-00034-CR, 2011 Tex. App. LEXIS 1728, at **10-13 (Tex. App.—Beaumont Mar. 9, 2011, no pet.) (mem. op., not designated for publication) (applying *Torres* and concluding that the defendant was not entitled to use evidence of a prior specific act of violence to show that the victim was the first aggressor).

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 26, 2021
Opinion Delivered July 14, 2021
Do Not Publish

Before Golemon, C.J., Kreger and Johnson, JJ.